**MANAGEMENT INFORMATION TECHNOLOGIES, INC., et al., Plaintiffs,**

v.

**ALYESKA PIPELINE SERVICE COMPANY, et al., Defendants.**

Civ. A. No. 92–1730.

United States District Court, District of Columbia.

Nov. 2, 1993.

See also, 151 F.R.D. 471.

John Michael Clifford, Richard Taylor Rossier, Mona Lyons and Christine Marie Cooper, McLeod, Walkinson & Miller, Washington, DC, for Management Information Technologies, Inc., and Charles Hamel and Kathleen Hamel.

Robert Elijah Jordan, III, Jerald Shropshire Howe, Jr., Morgan Day Hodgson, Christian R. Bartholomew, and William Lewis Martin, II, Steptoe & Johnson, Washington, DC, for Alyeska Pipeline Service Co., Inc., ARCO Transp. Corp. and BP Pipeline Corp.

Robert Kenly Webster and Thomas W. Mitchell, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for James Patrick Wellington.

Gerard F. Treanor, Cacheris & Treanor, and Amy Berman Jackson, and Douglas D. Connah, Jr., Venable, Baetjer, Howard & Civiletti, Washington, DC, for the Wackenhut Corp.

Richard Craig Warmer, O'Melveny & Myers, Washington, DC, for Exxon Pipeline Corp. and Exxon Corp.

Gerard F. Treanor, Cacheris & Treanor; Jonathan S. Feld, John Whitelaw Nields, Jr., Howrey & Simon, and Larry Stuart Gondelman, and Clinton Ray Batterton, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Wayne B. Black and Richard Lund.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Before the Court is plaintiffs' motion for reconsideration of defendants' motions to compel the production of documents. Based on motions filed by the parties and responses thereto, as well as extensive oral argument, the motion for reconsideration will be granted and the motions to compel will be denied.

1. *General Background*

This case involves a suit by Charles and Kathleen Hamel against the Alyeska Pipeline Corporation, its owner companies, the Wackenhut Corporation, a private security/investigation firm, as well as individual named defendants. Plaintiffs, Charles Hamel, Kathleen Hamel and Management Information Technologies, Inc. ("MITI"), brought this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, the Fair Credit Reporting Act, 15 U.S.C. § 1681, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.* (as amended by the Electronic Communications Privacy Act of 1986).[1] Plaintiffs also have requested relief under a number of pendant state law claims, including fraudulent misrepresentation, invasion of privacy, trespass, intentional infliction of emotional distress and negligence.

Defendant Alyeska Pipeline Service Company operates the Trans–Alaska Pipeline System ("TAPS") on behalf of the owners of TAPS. Approximately 90% of the ownership interest in TAPS is held by Defendants BP Pipeline, ARCO Pipeline Company, and Exx-

---

1. The claims alleged by the plaintiffs under these acts will be referred to as the RICO, FCRA and Title III claims, respectively.

on Pipeline Company (hereinafter collectively referred to as "Owners").

Defendant Wackenhut Corporation is an international security firm, organized under the laws of the State of Florida, which provides security for the Trans–Alaska Pipeline through its wholly-owned subsidiary American Guard and Alert. Wackenhut also provides security services in Washington, D.C. Defendants Wayne B. Black and Richard Lund are Florida residents and employees of Wackenhut. Defendant James Patrick Wellington is a resident of Anchorage, Alaska and the Director of Security at Alyeska.

Charles Hamel, presently a resident of Virginia, had been an independent oil and shipping broker. He alleges that he lost his business when the oil delivered by Alyeska to his tankers was found to be significantly diluted with water. His unsuccessful attempts to work out this problem with some of the defendants in this case resulted in his reporting environmental wrongdoing on the part of Alyeska to the U.S. Environmental Protection Agency ("EPA"), Congress and Alaska's Department of Environmental Conservation.

Plaintiffs allege that, as a result of Mr. Hamel's reporting Alyeska's environmental abuses, Alyeska and the Owners embarked on a scheme "to obtain information and documents in the Hamels' possession and to prevent, through intimidation, Charles Hamel and his sources from reporting serious environmental wrongdoing by Alyeska" to the pertinent government entities. First Amended Complaint at ¶ 3. Plaintiff MITI became involved in the case as a result of its association with Mr. Hamel, who was a member of the Board of MITI and frequently used its mailing address to receive information from his sources within Alyeska. Wackenhut was engaged to execute the plan.

Plaintiffs allege that, in implementing the plan, the Defendants created a "dummy" environmental organization called "The Ecolit Group", which they used to gain the Hamels' confidence and cooperation; taped the Hamels' personal phone calls, meetings and other private conversations; took documents from the Hamels' home without authorization; illegally searched the Hamels' trash; stole unopened mail; and illegally obtained the Hamels' phone records and the Hamels' private credit information.

The defendants strenuously assert that they engaged in no illegal activity. One defense theory posited by Defendants is that they were justified in investigating the Hamels because Alyeska reasonably believed that the Hamels possessed stolen company property:

> [A]n investigation was undertaken for the specific purpose of inquiring into the circumstances surrounding the wrongful and unlawful taking of documents protected by the attorney-client privileged [sic] and other documents and information in which Alyeska had a protected property right and to determine the circumstances involving the wrongful and unlawful taking and appropriation of other documents and information in which Alyeska had a protected property right.

*Joint Answer of Defendants Alyeska Pipeline Service and J. Patrick Wellington to First Amended Complaint and Counterclaims of Alyeska Pipeline Service Company,* ¶ 3 at 2. Alyeska defends other actions taken with regard to Hamel as "a perfectly predictable and lawful reaction of a company responding to public accusations of a frequent and vocal critic of the company." *Id.,* ¶ 32 at 12. In brief, Alyeska asserts that because of the invasive conduct engaged in by Mr. Hamel, he deprived himself of any reasonable expectation of privacy. *Id.,* Sixth Affirmative Defense, ¶ 3 at 81. Alyeska also has a counterclaim against Hamel asking for the return of any stolen Alyeska documents and an injunction against future thefts.

The events which underlie this case have been the subject of a Congressional investigation by the Committee on Interior and Insular Affairs of the House of Representatives. This inquiry resulted in majority and minority reports which differed sharply about the legality and propriety of Alyeska's activities with regard to Mr. Hamel. *See Report of the Committee on Interior and Insular Affairs,* 102nd Cong., 2nd Sess., Alyeska Pipeline Service Company Covert

Operation, Part I (Comm.Print No. 9, July 1992).

### 2. *Background to this Order*

Charles Hamel has refused to reveal the names of the sources within Alyeska who allegedly provided him with company documents. He has also refused to turn over copies of any documents received from confidential sources within Alyeska that may betray the identities of his confidential informants.

On August 13, 1993 Judge Lamberth, acting as duty judge, ordered the plaintiffs to turn over all responsive documents which had been withheld based on assertions of privilege and/or confidentiality. These documents, if turned over, would identify the Hamels' confidential Alyeska sources. On August 26, 1993 this Court ordered a stay of the August 13 order pending briefing and a hearing on plaintiffs' motion for reconsideration. At a hearing on September 7, 1993, this Court noted that the information would be discoverable only if the confidential sources could be adequately protected against retaliation and suggested that the parties negotiate some arrangement that would protect the non-party sources. The parties were unable to come to an agreement and on October 6, 1993, defendants filed a request for a protective order that would require the Hamels to reveal the names of the confidential sources to defense counsel, but which would prevent defense counsel from revealing the identities of the protected sources without further order of this Court.

Defendants state that the documents are required for three specific reasons. First, the documents would go to show that Wellington and Alyeska were justified in their investigation of Hamel:

Plaintiffs claim that Mr. Wellington's unlawful actions were committed during an illegal undercover operation, that the "scheme" was not justified, and that Wellington's purpose was to harass, intimidate and injure the plaintiffs. The core of Mr. Wellington's defense is that the investigation was a justified and legal attempt to (i) determine who was stealing confidential Alyeska documents, (ii) recover Alyeska's stolen documents, and (iii) ensure that no thefts occur in the future.... The documents at issue prove the legitimacy of the investigation.

*J. Patrick Wellington's Reply in Support of Defendants' Motion to Compel Production of Documents* at 5. Second, defendants argue that the documents will demonstrate that they were acting in good faith, thereby negating any claim for punitive damages. And finally, defendants argue that the documents are necessary to learn the identities of Hamel's sources within the company. Alyeska and Wellington argue that these whistleblowers are potential witnesses who can testify about the circumstances leading to Hamel's possession of Alyeska documents. The whistleblowers would also be able to testify about Mr. Hamel's state of mind with regard to Alyeska's investigation. For example, if Mr. Hamel was actually delighted, rather than traumatized to learn that he was the subject of a covert investigation by Alyeska and Wackenhut, then evidence of this reaction through his conversations with his sources would go to the issue of damages.

### 3. *Analysis and Decision*

The Court is unwilling to subject non-parties who work for Alyeska or its owner companies to the possible retaliation that frequently results when a whistleblower is identified. The case law, academic studies, and newspaper accounts well document the kind of treatment that is usually visited upon public and private employees who speak out as a matter of conscience on issues of public concern. For example, a six-year study on whistleblowers by Myron Peretz Glazer and Penina Migdal Glazer details the full spectrum of management retaliation against ethical resistors who speak out against company or government policy and the long-term adverse consequences such employees can face. *See, Myron Peretz Glazer and Penina Migdal Glazer, The Whistleblowers: Exposing Corruption in Government and Industry* 231 (1990) (study of sixty-four whistleblowers showed significant percentage "remain out of work or underemployed, bitter about their punishment, and uncertain of ever being able to restore their lives fully"). *See also, Hathaway v. Merit Systems Protection Bd.,* 981

F.2d 1237 (Fed.Cir.1992) (upholding determination by Merit Systems Protection Board that employee was threatened with removal and unsatisfactory performance because disclosure of questionable employment practices); United States Merit Systems Protection Board, Office of Merit Systems Review and Studies, *Whistleblowing and the Federal Employee: Blowing the Whistle on Fraud, Waste, and Mismanagement—Who Does It and What Happens* 3 (Oct. 1981) (noting that while retaliation is not universal, a significant percentage of federal employees who reported waste or abuse felt they were adversely affected by speaking out); Matthew L. Wald, *Whistleblower at Nuclear Laboratory Was Disciplined, Labor Dept. Rules,* N.Y. Times, Feb. 5, 1992 at A12 (describing episode where after speaking out on television, employee of government contractor was first isolated from other workers and supervisors and then transferred to room containing radioactive waste).

The motive for retaliation by employers is obvious:

> To their detractors, whistleblowers are viewed as 'snitchs', 'stool pigeons', or 'industrial spys' who are willing to publicly embarrass their co-workers and their companies in order to satisfy their political, ethical, moral, or personal agendas. Such employees not only wish to hurt their companies, their detractors argue, but also wish to keep their jobs.

Daniel P. Westman, *Whistleblowing: The Law of Retaliatory Discharge* vii (1991). The retaliation that occurs may not be so obvious as to involve the termination or transfer of whistleblowing employees but may nonetheless have negative impact on the whistleblowers' careers. "[T]here are countless ways of making their position difficult, to the point where they may be brought to resign or their own volition, or to stay while bitterly regretting that they had spoken out." Sissela Bok, *Secrets: On the Ethics of Concealment and Revelation* 226 (1982); *See also* U.S. Merit Systems Protection Board, *supra* at 33 ("The most frequently cited forms of reprisal are more subjective, discretionary actions, such as poor performance appraisal, assignment of less desirable or less important duties, and denial of promotion.").

There is precedent in this circuit for taking into consideration the interests of unidentified whistleblowing employees when confronted with a motion to compel. In *United States v. Garde,* 673 F.Supp. 604 (D.D.C. 1987) the Nuclear Regulatory Commission moved to compel the names of whistleblowers who had made allegations of safety problems at a nuclear power project in Texas. Recognizing the potential for retaliation against the confidential whistleblowing sources and the lack of assurance that the confidential sources would be protected against retaliation, the Court in *Garde* denied the motion to compel by relying on the employees First Amendment rights of association.

In another case involving these same parties, *Alyeska Pipeline Service Co. v. Environmental Protection Agency,* 856 F.2d 309 (D.C.Cir.1988), Alyeska had filed a freedom of information act request for documents that confidential sources had given to Hamel and that Hamel had turned over to the E.P.A. Within the context of the F.O.I.A., the D.C. Circuit declined to order the E.P.A. to turn over the documents, in part because release of the documents would permit the identification of the employees who provided the documents, and thereby subject them to the risk of harassment or reprisals. *Id.* at 312.

In keeping with the spirit, if not the reasoning of the *Garde* and *Alyeska* cases, this Court will not order Mr. Hamel to identify his confidential sources within Alyeska or to turn over documents that could identify his confidential sources unless and until the Court is satisfied that the sources will be adequately protected against retaliation. To date, the Court has not received from defense counsel the protections necessary to assure that the whistleblowers will not be targeted for reprisal.

This decision is based on the Court's balancing of the interests of third parties with the needs of the defendants to defend themselves in the present proceeding. In this regard, based upon the present posture of this case, it is the Court's belief that the identities of the confidential informants do

not go to the heart of the case and are at best marginally relevant to the issues at stake in this litigation. This dispute is between MITI, the Hamels and the defendants. Whether Alyeska can now adequately rationalize the investigation of the Hamels does not turn on the identity of certain whistleblowers. It turns on what information Alyeska had at the time the defendants commenced the alleged improper conduct. The identities of the confidential sources are not crucial, either specifically for the defense or for the broader purpose of additional discovery. As the Court made clear in a prior order, discovery in this case has probably gone too far already.[2]

The Court is also troubled by Plaintiffs' assertion that Alyeska engaged in the pattern of activity alleged in the complaint in part to learn the identities of Mr. Hamel's sources within the company. It would be a tragic irony if, by order of this Court, Alyeska were able to compel through lawful means what it was unable to obtain via allegedly unlawful and indirect means.

The potential harm to these whistleblowers is great, and this Court will not subject them to retaliation which might include the loss of their jobs. The Court is unimpressed with assurances by the defendants that the whistleblowers would be protected against retaliation by federal law. For these reasons plaintiffs' motion to reconsider will be granted and defendants' discovery requests will be denied. Defendants request for a protective order will also be denied. Of course, once the trial commences and the issues become better defined, if the information sought becomes clearly relevant, the Court will entertain a renewed defendants' motion.

---

**2.** Courts throughout the land are confronted with the issue of releasing the identities of confidential informants in criminal cases on a daily basis. Rarely, if ever, are the identities of informants revealed to criminal defendants. It would seem rather incongruous for courts to decline to turn over such information in proceedings where a defendant's liberty is at stake while providing such materials in a civil setting where money damages alone are involved.