**In re SILICON GRAPHICS INC. SECURITIES LITIGATION.**

Edmund J. Janas, Plaintiff–Appellant,

v.

Edward R. McCracken; Michael Ramsay; Robert K. Burgess; Thomas J. Oswald; Teruyasu Sekimoto; Forest Baskett; Stephen Goggiano; William M. Kelly; Lucille Shapiro; Silicon Graphics, Inc., Defendants–Appellees.

Deanna Brody; Andrea S. Donald; Israel Buck; Ruth Buck; Denise Struthers; Thomas G. Di Cicco Ira; Steven B. Ewall; Rosalyn Golaine; Jerry Krim; Mary Anne Beke; Herman Grossman; Samuel J. Reiner; Dennis Lucas, Plaintiffs–Appellants,

v.

Edward R. McCracken; Michael Ramsay; Robert K. Burgess; Thomas J. Oswald; Teruyasu Sekimoto; Forest Baskett; Stephen Goggiano; William M. Kelly; Lucille Shapiro; Silicon Graphics, Inc., Defendants–Appellees.

Nos. 97–16204, 97–16240.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1998.

Filed July 2, 1999.

Amended Aug. 4, 1999.

Amended Concurring and Dissenting Opinion Aug. 25, 1999.

Paul F. Bennett, Gold Bennett & Cera, San Francisco, California, for plaintiff-appellant Edmund J. Janas; Leonard B. Simon, Milberg Weiss Bershad Hynes & Lerach, San Diego, California, for plaintiffs-appellants Deanna Brody, et al.

Richard H. Walker, General Counsel, Securities and Exchange Commission, Washington, DC, for amicus curiae Securities and Exchange Commission.

Jonathan C. Dickey, Gibson, Dunn & Crutcher, LLP., Palo Alto, CA, for amicus curiae American Electronics Association.

Bruce G. Vanyo, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for the defendants-appellees.

Before: BROWNING and SNEED, Circuit Judges, and RHOADES,[1] District Judge.

Opinion by Judge SNEED; Concurrence and Dissent by Judge BROWNING.

SNEED, Circuit Judge:

This case requires us to interpret the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2] Congress enacted the PSLRA to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs. *See, e.g.,* H.R. Rep. Conf. No. 104–369, at 32–41 (1995); *see also* 15 U.S.C. § 78u–4(b)(1), (2) (1997). In doing so, Congress generated a flood of litigation and commentary regarding the proper interpretation of these standards. Much of this litigation deals specifically with the pleading issue now before us, i.e., what must a plaintiff allege in order to satisfy the requirement that he state facts giving rise to a "strong inference" of the required state of mind? *See* 15 U.S.C. § 78u–4(b)(2) (requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

Due to the nature of this litigation, we shall depart somewhat from the customary form of opinions of this Court by discussing generally what we hold to be the pleading standard under the PSLRA.

---

1. The Honorable John S. Rhoades, United States District Judge for the Southern District of California, sitting by designation.

2. The PSLRA amends the Securities Exchange Act of 1934, and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. *See, e.g.,* 15 U.S.C. § 78u–4(a)(1) (1997).

Thereafter, we will set forth the facts of this case and then apply that standard to those facts.

### I.

### *THE PSLRA PLEADING STANDARD: THIS COURT'S INTERPRETATION*

■ We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. Our holding rests, in part, on our conclusion that Congress intended to elevate the pleading requirement above the Second Circuit standard requiring plaintiffs merely to provide facts showing simple recklessness or a motive to commit fraud and opportunity to do so. We hold that although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, we hold that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA. We think that our holding represents the best way to reconcile Congress' express adoption of the Second Circuit's so-called "strong inference standard" with its express refusal to codify that circuit's case law interpreting the standard. However, we are mindful that not all courts share our view.

### A.

### *Other Interpretations*

There is widespread disagreement among courts as to the proper interpretation of the PSLRA's heightened pleading requirement. *See* 15 U.S.C. § 78u–4(b)(1), (2). To date, the Second, Third and Sixth Circuits are the only other courts of appeals to address the issue squarely. *See*

*In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542 (6th Cir.1999) (holding that "plaintiff may survive a motion to dismiss by pleading facts that give rise to a 'strong inference' of recklessness"); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525 (3d Cir. 1999) (holding that "it remains sufficient for plaintiffs plead [sic] scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior' "); *Press·v. Chemical Inv. Serv. Corp.,* 166 F.3d 529 (2d Cir.1999) (holding that a plaintiff "must either (a) allege facts to show that 'defendants had both motive and opportunity to commit fraud' or (b) allege facts that·'constitute strong circumstantial.evidence of conscious misbehavior or recklessness' "). Of the district courts considering the issue, roughly sixty percent (some twenty cases) have followed the Second Circuit, while the others have interpreted the PSLRA as adopting some higher standard.

Generally, the district courts have taken three different approaches: (1) apply the Second Circuit standard requiring plaintiffs to plead mere motive and opportunity or an inference of recklessness, *see e.g., Epstein v. Itron Inc.,* 993 F.Supp. 1314 (E.D.Wash.1998); *Robertson v. Strassner,* 32 F.Supp.2d 443, 447 (S.D.Tex.1998); *In re Wellcare Management Group, Inc. Sec. Litig.,* 964 F.Supp. 632 (N.D.N.Y.1997); (2) apply a heightened Second Circuit standard rejecting motive and opportunity, but accepting an inference of recklessness, *see e.g., Myles v. MidCom Communications, Inc.,* No. C96–614D (W.D.Wash. Nov. 19, 1996); *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345 (D.Colo.1998); or (3) reject the Second Circuit standard and accept only an inference of conscious conduct, *see e.g., Voit v. Wonderware Corp.,* 977 F.Supp. 363 (E.D.Pa.1997); *Powers v. Eichen,* 977 F.Supp. 1031 (S.D.Cal.1997); *Friedberg v. Discreet Logic Inc.,* 959 F.Supp. 42 (D.Mass.1997); *Norwood Venture Corp. v. Converse, Inc.,* 959 F.Supp. 205, 209 (S.D.N.Y.1997). For further dis-

cussion of the cases, *see, e.g.,* Richard H. Walker and J. Gordon Seymour, *Recent Judicial and Legislative Developments Affecting the Private Securities Fraud Class Action,* 40 Ariz. L.Rev. 1003 (1998).

We embrace the approach requiring a strong inference of deliberate recklessness which lies between the second and third approaches. We do this because we believe that Congress intended to bar those complaints that fail to raise a strong inference of intent or deliberateness. The "deliberate recklessness" standard best serves the PSLRA's purpose. The PSLRA text and legislative history support our conclusion.

### B.

### *The Bases for Our Interpretation*

■ To determine the proper pleading standard under the PSLRA, we turn first to the text of the statute. If the language is plain and its meaning clear, that is the end of our inquiry. *See Northwest Forest Resource v. Glickman,* 82 F.3d 825, 831 (9th Cir.1996).

### 1. *The Plain Language of the PSLRA*

The PSLRA provides, in pertinent part:

**(b) Requirements for securities fraud actions** ... **(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (bold emphasis in original; underline emphasis added). Under this provision, the mental state re-

quired for securities fraud liability is distinct from the level of pleading required to infer that mental state. Therefore, we must make two separate determinations: (1) what is the required state of mind; and (2) what constitutes a strong inference of that state of mind.

### a. *Required state of mind*

■ The "required state of mind" in § 78u–4(b)(2) refers to the scienter requirement applicable to the underlying securities fraud claim brought by the plaintiff. In this case, Brody brought her securities fraud action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, which establishes a private cause of action for securities fraud. *See* 17 C.F.R. § 240.10b–5. Therefore, we look to § 10(b) for the required state of mind.[3]

The Supreme Court has defined "scienter" in the context of § 10(b) as a "mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). In *Hochfelder,* the Supreme Court addressed the question of whether a civil action for damages under § 10(b) would lie for negligent conduct. It decided that no conduct—negligent or otherwise—is actionable under § 10(b) unless plaintiffs make a showing of "scienter," i.e., "intent to deceive, manipulate, or defraud." *Id.* at 193, 96 S.Ct. at 1381, 47 L.Ed.2d 668. The Supreme Court reasoned that § 10(b) makes unlawful the use of "any manipulative or deceptive device or contrivance" in contravention of SEC Rules. *Hochfelder,* 425 U.S. at 197, 96 S.Ct. at 1383, 47 L.Ed.2d 668. As a result, the Court held that "[t]he words 'manipulative and deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe *knowing or intentional misconduct.*" *Id.* (citations omitted) (emphasis added).[4]

---

**3.** *See In re Comshare,* 183 F.3d at 550 ("Indeed, we assume that Congress was aware of the 'contemporary legal context' surrounding the state of mind requirement for S 10(b) and Rule 10b–5 liability and, by its silence, left it undisturbed in the PSLRA.").

**4.** *Accord Santa Fe Indus. v. Green,* 430 U.S. 462, 473, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977) (holding that Congress intended for § 10(b) to prohibit only conduct involving manipulation or deception); *Central Bank v. First Interstate Bank,* 511 U.S. 164, 173–74,

Although the Supreme Court concluded that § 10(b) was intended to proscribe "knowing" or "intentional" conduct as opposed to negligent conduct, it noted that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Id.* at 193–94 n. 12, 96 S.Ct. at 1381 n. 12, 47 L.Ed.2d 668. Accordingly, the Supreme Court left open the question of whether, in some circumstances, "reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.*

After *Hochfelder,* but long before enactment of the PSLRA, we answered that question in the affirmative, holding that "Congress intended the ambit of § 10(b) to reach a broad category of behavior, including knowing or reckless conduct." *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir. 1978). In *Nelson,* we declined to define recklessness, but our opinion indicates that we viewed it as a form of intentional, not merely negligent, conduct. We expressly acknowledged the Supreme Court's words in *Hochfelder* that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Id.* (quoting *Hochfelder,* 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381, n. 12, 47 L.Ed.2d 668). Moreover, we stated that "the evidence supports a finding of recklessness, or some degree of intent not sufficiently aggravat-

ed to be characterized as 'deliberate and cold-blooded.'" *Id.* at 1338. Thus, we apparently followed the Supreme Court's guidance in *Hochfelder* that reckless behavior in the § 10(b) context is merely a lesser form of intentional conduct.

In *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990) (en banc), we again held that "recklessness satisfies the element of scienter in a civil action for damages under § 10(b) and Rule 10b–5." 914 F.2d at 1568–69. This time, we explicitly defined recklessness:

> Today we adopt the standard of recklessness articulated by the Seventh Circuit in *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977) ... [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger,* 914 F.2d at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)). Our definition of recklessness, as taken from *Sundstrand,* strongly suggests that we continued to view it as a form of intentional or knowing misconduct.[5] We used the

---

114 S.Ct. 1439, 1446, 128 L.Ed.2d 119 (1994) (holding that there is no § 10(b) liability for negligence or aiding and abetting because the "language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception").

5. The *Sundstrand* Court, when it defined recklessness, made clear that recklessness should be viewed "as the functional equivalent of intent." 553 F.2d at 1045. The Court stated:

> Apparently the only post-Hochfelder reported definition of recklessness in the context of omissions appears in *Franke v. Midwestern Oklahoma Dev. Auth.,* 428 F.Supp. 719 (W.D.Okla.1976):
>
> > "reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable

negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

As the Supreme Court conceded in Hochfelder:

> "In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381.

The Franke definition of recklessness is "the kind of recklessness that is equivalent to wilful fraud". *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2d Cir.1968).... Indeed, the Franke definition of recklessness should be viewed as the *functional equivalent of intent.*

words "known" and "must have been aware," which suggest consciousness or deliberateness. Indeed, we expressly acknowledged our own prior statement that "recklessness is a form of intent rather than a greater degree of negligence," *see id.* (citing *Vucinich v. Paine, Webber, Jackson & Curtis Inc.,* 739 F.2d 1434, 1435 (9th Cir.1984)), and the Supreme Court's statement that recklessness in the context of § 10(b) is a form of intentional conduct, *see id.* at 1568 (quoting *Hochfelder,* 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381, n. 12, 47 L.Ed.2d 668).[6]

These cases indicate that recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct.[7] To repeat, recklessness in the § 10(b) context is, in the words of the Supreme Court, a form of intentional conduct. *See Hochfelder,* 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381 n. 12, 47 L.Ed.2d 668. For this reason, we read the PSLRA language that the particular facts must give rise to a "strong inference ... [of] the required state of mind" to mean that the evidence must create a strong inference of, at a minimum, "deliberate recklessness."

We now turn to our second inquiry, i.e., what constitutes a strong inference of deliberate recklessness?

#### b. *What constitutes a strong inference of the required state of mind*

Again, we begin with the language of the statute because if the language is clear, we need inquire no further. *See Glickman,* 82 F.3d at 830–31. In this case, the statute is silent as to the central issue: the text of the PSLRA does not state whether motive

and opportunity or circumstantial evidence of simple recklessness are sufficient to raise a "strong inference" of deliberate recklessness. The plain text of the PSLRA leaves it open for us to consider circumstantial evidence of recklessness and motive and opportunity as evidence of deliberate recklessness. However, it does not indicate whether they alone are enough to establish a "strong inference" of deliberate recklessness. In the absence of a clear command in the text, we turn to the legislative history for guidance. *See id.*

#### 2. *The Legislative History of the PSLRA*

When examining the legislative history, we first look to the conference report because, apart from the statute itself, it is the most reliable evidence of congressional intent. *See id.* at 835. In this case, the conference report suggests both that Congress generally intended to raise the pleading standards to eliminate abusive securities litigation and that it specifically intended to raise the pleading standard above that in the Second Circuit. *See, e.g.,* H.R. CONF. REP. 104–369, at 31, 41.

It is clear from this conference report that Congress sought to reduce the volume of abusive federal securities litigation by erecting procedural barriers to prevent plaintiffs from asserting baseless securities fraud claims. In a joint statement, managers from the House and Senate declared that "Congress has been prompted by significant evidence of abuse in private securities lawsuits to enact reforms to protect investors and maintain confidence in our

---

*Sundstrand,* 553 F.2d at 1045 (emphasis added).

**6.** *See also Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996) (holding that plaintiffs can establish scienter by proving recklessness, but not altering the more fundamental principle that "[t]o establish scienter, plaintiffs must show that defendants had 'a mental state embracing an intent to deceive, manipulate, or defraud' ") (citations omitted).

**7.** The Sixth Circuit apparently agrees. In its recent case interpreting the PSLRA, the Sixth Circuit conducted a similar analysis and stated that "[b]ecause it is clear that recklessness, understood as a mental state apart from negligence and *akin to conscious disregard,* may constitute scienter, we conclude that under the PSLRA, a plaintiff may survive a motion to dismiss by pleading facts that give rise to a 'strong inference' of recklessness." *In re Comshare,* 183 F.3d at 550 (emphasis added).

capital markets." H.R. CONF. REP. 104–369, at 31. The managers observed that plaintiffs routinely were filing lawsuits "against issuers of securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action[.]" *Id.* They recognized that plaintiffs, by targeting "deep pocket defendants," could misuse the discovery process "to impose costs so burdensome that it [was] often economical for the victimized party to settle[.]" *Id.* In general, the conference report makes it clear that Congress designed the PSLRA to deter non-meritorious lawsuits by creating procedural barriers such as heightened pleading standards. *Id.* at 41.

It is also clear from the legislative history that Congress sought more specifically to raise the pleading standard above that in the Second Circuit. First, Congress declined to enact an amendment that would have adopted the Second Circuit rule. It is true that during the floor debate of its version of the PSLRA, the Senate tentatively adopted the Specter Amendment which codified the Second Circuit's two-pronged "motive and opportunity" and "recklessness" test. *See* 141 CONG. REC. S9,170 (daily ed. June 27, 1995). However, the joint conference committee—consisting of House and Senate managers charged with reconciling differences between the House and Senate bills—declined to incorporate the Specter Amendment in the final version of the PSLRA. *See* H.R. CONF. REP. 104–369, at 41. In doing so, they implicitly rejected the Second Circuit's two-pronged test. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (holding that where the conference committee has expressly declined to adopt proposed statutory language, its action "strongly militates against a judgment that Congress intended [the] result that it expressly declined to enact").

Second, the joint committee expressly rejected the Second Circuit's two-prong test in favor of a more stringent standard. The joint committee stated:

> The Conference Committee language is based in part on the pleading standard of the Second Circuit.... Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. *Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.*[23]
>
> [23] *For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.*

H.R. CONF. REP. 104–369, at 41 n.23 (emphasis added). *See also* S. Rep. 104–98, at 15 ("The Committee does not intend to codify the Second Circuit's caselaw interpreting [the strong inference] pleading standard, although courts may find this body of law instructive."). Thus, although Congress derived the PSLRA "strong inference" language from the Second Circuit, it rejected the less stringent Second Circuit case law interpreting that "strong inference" language. To repeat, the conference committee purposely chose not to include in its pleading standard language derived from Second Circuit case law relating to motive, opportunity or recklessness.

Thus, Congress did not codify the Second Circuit case law. The joint committee sought to "strengthen existing pleading requirements." *See* H.R. CONF. REP. 104–369, at 41. The Second Circuit case law setting forth its two-prong test existed at the time the PSLRA was passed. Clearly, Congress sought to raise the standard above all existing requirements. Congress could have adopted outright the Second Circuit standard. It did not do so. It follows that Congress sought to raise the standard above that in the Second Circuit.

We recognize that the PSLRA's "strong inference" language is taken directly from the Second Circuit. That is not determinative, however. The legislative history leads us to conclude that Congress adopted the Second Circuit's "strong inference" language only because it was facially more stringent than the "reasonable inference" standard in other circuits, see, e.g., Provenz, 102 F.3d at 1490. It does not indicate that Congress intended to adopt the Second Circuit's underlying two-prong test. After all, Congress expressly rejected the Second Circuit case law interpreting the "strong inference" standard.[8] To repeat, Congress intended for the PSLRA to raise the pleading standard even beyond the most stringent existing standard.

Congress further provided very strong evidence of its intent to go beyond the Second Circuit standard when it overrode President Clinton's veto of the PSLRA. In his veto message to Congress, President Clinton expressed concern that Congress had elevated the pleading standard above that required in the Second Circuit. President Clinton stated:

> I believe that the pleading requirements of the Conference Report with regard to a defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the high pleading standards of the U.S. Court of Appeals for the Second Circuit- the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of the Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

141 CONG. REC. H15,214 (daily ed. Dec. 10, 1995). Notwithstanding the President's concerns, Congress overrode his veto, and the PSLRA became law. In doing so, Congress provided powerful evidence of its intent to elevate the pleading standard to a level beyond that in the Second Circuit.

In sum, the legislative history supports our conclusion that the PSLRA pleading standard is higher than the standard of the Second Circuit. We find that because the joint committee expressly rejected the "motive and opportunity" and "recklessness" tests when raising the standard, Congress must have intended a standard that lies beyond the Second Circuit standard. Had Congress merely sought to adopt the Second Circuit standard, it easily could have done so. It did not do so. Instead, Congress adopted a standard more stringent than the Second Circuit standard. It follows that plaintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere "motive and opportunity" or "recklessness," but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent. Thus, we agree with the district court that the PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness. We believe that this "deliberate recklessness" standard best reconciles Congress' adoption of the Second Circuit's so-called "strong inference standard" with its express refusal to codify that circuit's two-prong "motive and opportunity" and "recklessness" test.

Having determined that the PSLRA requires plaintiffs to plead particular facts giving rise to a strong inference of deliberate recklessness, we must determine whether the plaintiffs in this case have satisfied that requirement.

## II.

### FACTS AND PROCEDURAL BACKGROUND

Deanna Brody ("Brody") filed a securities fraud class action in the United States

---

**8.** In the Second Circuit's own recent words, it "has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press,* 166 F.3d at 538 (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 270–71 (2d Cir.1993)).

District Court for the Northern District of California alleging that Silicon Graphics, Inc. ("SGI") and six of its top officers ("officers")[9] made a series of misleading statements to inflate the value of SGI's stock while they engaged in "massive" insider trading. The district court dismissed Brody's complaint for failure both: (1) to state a claim under Federal Rule of Civil Procedure 12(b)(6); and (2) to satisfy the PSLRA pleading requirements. The district court also granted summary judgment to four individual officers on the issue of misrepresentation. Brody now appeals, arguing that dismissal was improper because her complaint included facts sufficient to meet the PSLRA pleading standard and that summary judgment was improper in the absence of discovery. We disagree.

Based on the same events, Edmund J. Janas ("Janas") filed a shareholders' derivative suit claiming that SGI's officers breached their fiduciary duties to SGI, were grossly negligent in managing the company, and engaged in improper insider trading. Again, the district court dismissed the complaint, holding that Janas failed to allege a pre-suit demand on SGI's directors as required by Federal Rule of Civil Procedure 23.1. Janas now appeals. On appeal, he argues that the district court abused its discretion when it concluded that it would not have been futile for Janas to make a demand on the directors. Janas also claims that the district court improperly denied him leave to amend. Again, we disagree.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm. We hold that although Brody has stated facts giving rise to some inference of fraudulent intent, her factual allegations are insufficient to create a *strong* inference of deliberate recklessness. We also conclude that the uncon-

tested affidavits offered by the individual officers were adequate to support summary judgment in their favor. With regard to Janas's derivative suit, we hold that he was not excused from making a pre-suit demand upon the directors and that he could not have amended his complaint to show that such a demand would have been futile. As a result, we hold that dismissal with prejudice was appropriate.

## A.

### *Brody's First Amended Complaint*

Brody's First Amended Complaint asserts[10] that SGI is a Delaware Corporation that manufactures desktop graphic workstations and software. In July 1995, SGI reported 45% revenue growth for Fiscal Year 1995 ("FY95") and projected similar growth for Fiscal Year 1996 ("FY96"). At the same time, SGI announced plans to produce a line of graphic design computers called the "Indigo2 Impact Workstation" ("Indigo2") which it developed to compete with a new line of Hewlett–Packard workstations. SGI planned to ship the Indigo2 in volume by September 30, 1995, the end of the first quarter of FY96, and an upgraded version by January 1, 1996. SGI assured investors that Indigo2 would help sustain a 40% growth rate and exceed $1 billion in sales in FY96. SGI's projections drove its stock price to an all-time high of $44 7/8 on August 21, 1995.

By mid-September 1995, Brody further asserts, SGI began encountering quality control problems with a primary Indigo2 component, the Toshiba ASIC chip. Toshiba sent SGI a large number of defective chips, causing SGI to fall behind its production schedule. Brody alleges that the officers learned immediately of the defective chips through SGI internal reports, but continued to represent to investors

---

**9.** The individual defendants are Edward McCracken (President), Forest Baskett (Vice President), Robert Burgess (Senior Vice President), Michael Ramsay (Senior Vice President), Teruyasu Sekimoto (Senior Vice President), and William Kelly (Senior Vice President).

**10.** In reviewing dismissal under Rule 12(b)(6), we presume to be true all facts asserted by the plaintiff. *See Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997).

that production was proceeding without incident. Brody's complaint also included the following statements as examples of alleged misrepresentations:

September 19, 1995: McCracken told Morgan Stanley that there were "no supply constraints" on the Indigo2.

September 21, 1995: McCracken announced at an industry conference that Indigo2 sales growth "was accelerating."

September 22, 1995: McCracken told Morgan Stanley that "that there is no problem with [Indigo2], nor is there an engineering halt."

September 26, 1995: SGI announced "volume shipments" of the Indigo2 workstation.

The shortage of ASIC chips for the Indigo2 workstation compounded other major problems for SGI. The company was suffering through declining sales to the United States government and Original Equipment Manufacturers ("OEM"), languishing demand in Europe, and complications resulting from the reorganization of its sales force. As these problems became apparent, investors began to lose confidence in SGI's ability to maintain its high growth rate, and as a result, SGI's stock dropped to a low of $29 ⅞ on October 9, 1995.

On October 19, 1995, SGI announced that its revenue had grown just 33% during the first quarter of FY96, well below the projected growth of 40%. The disappointing first quarter performance, according to Brody, caused SGI's officers to fear another drop in the value of SGI stock. To prevent such a drop, Brody asserts that SGI's officers allegedly conspired to restore investor confidence by downplaying SGI's problems. In furtherance of their alleged "conspiracy," SGI's officers made the following statements which were intended to artificially inflate the value of SGI stock:

October 19, 1995: SGI issued a press release reporting that the Indigo2 was shipping in volume.

October 19, 1995: In a conference call, McCracken and other officers told securities analysts and institutional investors that SGI's sales force reorganization had been successful. The officers attributed the shortcoming in first quarter growth to a "temporary pause" in OEM sales, and a brief drop in demand from the U.S. Government and French businesses. SGI assured investors that (1) there were no manufacturing problems with or supply constraints on the Indigo2; (2) demand was strong for the workstation, and it was being shipped in volume; (3) the Indigo2 upgrade was on schedule and would be introduced in January 1996 as planned; and (4) the goal of 40% revenue growth for FY96 would be achieved.

October 19, 1995: McCracken stated during an interview that SGI's first quarter performance was "probably less" than the growth the company would see during FY96.

To further inflate the value of SGI stock, the company announced its plan to repurchase 1.3 million of its own shares immediately and another 5.7 million over a longer period. According to Brody, the statements had their intended effect: SGI's stock price dropped only slightly despite its disappointing first quarter results.

SGI's problems continued throughout October 1995. SGI again failed to ship the Indigo2 in volume and its sales continued to decline because the sales force reorganization had been ineffective. Moreover, demand for the Indigo2 remained low among OEM and European customers. As a result, SGI fell even farther below its target of 40% growth for FY96.

Brody alleges that SGI's officers learned of these problems through internal company reports. Notwithstanding the negative reports, the officers continued to make positive public statements in their allegedly conscious effort to mislead investors:

November 2, 1995: SGI officers held a press conference for securities analysts and investors, stating that (1) SGI would still achieve its goal of 40% revenue growth; (2) the failure to meet growth expectations for the first quarter resulted from temporary sales force reorgani-

zation problems and a temporary pause in OEM sales; (3) Indigo2 sales were beating expectations, and the product was now shipping in volume after some initial problems with the Toshiba ASIC chips; (4) development of the Indigo2 upgrade was proceeding as scheduled; and (5) SGI's second quarter performance would exceed its first quarter performance.

Early November 1995: SGI's first quarter report to shareholders included a letter from McCracken stating that the Indigo2 "began shipping in volume in September."

Again, Brody contends that these false and misleading statements had their intended effect: SGI's stock rose from $31 on November 1, 1995 to $36 1/4 on November 3, 1995. During the month of November, the individually named SGI officers allegedly took advantage of SGI's inflated stock value by selling 388,188 shares of SGI stock at prices as high as $37 7/8. On December 5, 1995, SGI stock reached a class-period high of $38 3/4. By mid-December, however, rumors began to circulate that SGI would again fall short of projected growth in the second quarter and its stock price began to drop. In effort to revive once more the value of the stock, SGI officers continued to make what Brody claims were false statements about SGI's performance:

December 15, 1995: McCracken and another SGI executive told Dean Witter that (1) SGI did well in November; (2) SGI's sales force productivity was improving; (3) SGI's sales to the U.S. government and in Europe were likely to improve; and (4) SGI would meet its goal of 40% growth for the second quarter.

Mid–December 1995: McCracken and another SGI executive told Smith Barney that despite sluggish sales, SGI would meet its goal of 40% growth.

Despite these reassurances, the price of SGI's stock continued to fall during the

**11.** *Reiner v. McCracken,* C–96–0631 FMS (N.D.Cal. Apr. 29, 1996), and *Krim v.*

month of December and by the end of the month, it had dropped to $26 7/8.

Soon thereafter, SGI began to publicly confirm the negative rumors about its performance. On January 2, 1996, the company announced its disappointing second quarter results and acknowledged that revenue growth for the year would be much lower than expected. The next day, SGI's stock fell to $21 1/8. On January 17, 1996, SGI's officers admitted to securities analysts that SGI had been unable to fill Indigo2 orders because of a shortage of ASIC chips and other primary components. They also acknowledged that OEM, North American, and European sales had all been down.

On January 26, 1996, Brody filed a securities fraud class action in federal district court, asserting claims for relief under sections 10(b) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t–1, and Rule 10b–5, 17 C.F.R. § 240.10b–5. Brody alleged, as already indicated, that during the class period—September 13, 1995, to December 29, 1995—SGI and its officers made material misrepresentations about the condition of the company and initiated a stock repurchase plan to inflate the price of SGI's stock. Brody claimed that six SGI officers took advantage of the inflated price and sold large blocks of stock.

### B.

#### *Janas' Complaint*

On May 22, 1996, Janas filed a shareholders' derivative suit against SGI's officers and directors based on essentially the same allegations set forth in Brody's complaint. Janas claimed that SGI's officers breached their fiduciary duties to SGI, were grossly negligent in managing the company, and engaged in improper insider trading.

The district court consolidated Brody's class action, Janas' derivative suit, and two other securities claims.[11] On September

*McCracken,* C–96–1111 FMS (N.D.Cal. Apr. 29, 1996).

25, 1996, the district court dismissed Brody's complaint for failure to state a claim, reasoning that it failed to satisfy the heightened pleading standard imposed by the PSLRA. In the same order, the district court dismissed Janas' derivative complaint because he failed to make a pre-suit demand on SGI's Board of Directors or otherwise show that a demand would have been futile. The district court dismissed Janas' complaint with prejudice, but granted Brody leave to amend. Brody subsequently filed an amended complaint which included greater factual detail than before. Nonetheless, on May 27, 1997, the district court dismissed her amended complaint, again on the ground that she failed to satisfy the pleading requirements of the PSLRA. The district court also granted four of the individual officers summary judgment on Brody's claim that they made false and misleading statements. The district court gave Brody ten days to supplement her allegations which she declined to do.[12] Accordingly, the district court entered judgment against Brody. This timely appeal followed.

## III.

### STANDARDS OF REVIEW

We review de novo the district court's dismissal of Brody's and Janas' complaints for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Johnson v. Knowles*, 113 F.3d at 1117. On review, we accept Brody's allegations as true and construe them in the light most favorable to her. *See id.* This Court reviews a grant of summary judgment de novo. *See Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1034, 140 L.Ed.2d 101 (1998). We review for abuse of discretion the district court's finding that it would not have been futile for Janas to make a demand on SGI's directors, *see Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 (9th Cir.1980),

but review de novo the district court's dismissal of Janas' complaint without leave to amend, *see Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir.1991).

We turn now to the question of whether the district court was correct in dismissing the complaints in this case.

## IV.

### DISCUSSION

#### A.

##### The Sufficiency of Brody's Complaint

We begin with Brody's class action. Brody contends that the district court erred in dismissing her complaint and insists that she pleaded facts sufficient to satisfy the PSLRA's pleading requirements. We disagree. Under the PSLRA, to repeat, Brody is required to state with particularity all facts giving rise to a "strong inference" of the required state of mind. *See* 15 U.S.C. § 78u–4(b)(1), (2). As we discussed, in order to create a strong inference of the required state of mind, Brody must state with particularity facts demonstrating deliberate recklessness. In order to plead "with particularity," Brody must provide all the facts forming the basis for her belief in great detail.

The PSLRA, to repeat, provides that plaintiffs alleging securities fraud shall "*state with particularity all facts*" on which their belief is based. 15 U.S.C. § 78u–4(b)(1) (emphasis added); *see also* 15 U.S.C. § 78u–4(b)(2). Although the words "facts" and "particularity" are not defined in the statute, their meaning is plain. When a statute does not define its terms, we employ the ordinary meaning of the words. *See Glickman*, 82 F.3d at 834. A "fact" is an "event or circumstance," *see* BLACK'S LAW DICTIONARY 591 (6th ed.1990), or "a truth known by actual experience or observation," *see* RANDOM

---

**12.** Although Brody had included an *in camera* filing which purportedly detailed counsel's investigation and described sources with the requisite specificity, the district court proper-

ly ruled that the attempt to submit the *in camera* filing was inappropriate and unsupported by authority.

HOUSE COLLEGE DICTIONARY 473 (rev. ed.1980). "Particularity" refers to "the quality or state of being particular," i.e., "dealing with or giving details; detailed; minute; circumstantial." *Id.* at 969. Thus, we read the statutory command that a plaintiff plead all the "facts" with "particularity" to mean that a plaintiff must provide a list of all relevant circumstances in great detail.

Here, Brody neither states facts with sufficient particularity nor raises a strong inference of deliberate recklessness. In her First Amended Complaint, Brody advances two primary grounds for her information and belief: (1) the existence of internal SGI reports that contradicted positive public statements made by the officers; and (2) the unusual sale of a massive amount of SGI stock by the officers. Specifically, Brody alleges that the SGI officers received SGI internal reports notifying them of serious production and sales problems with the Indigo2. Notwithstanding the alleged negative reports, the SGI officers continued to make positive representations to investors regarding production and sales of the Indigo2. Brody contends that the SGI officers intended for their positive comments to mislead investors and temporarily restore their faith in the company. According to Brody, the positive comments had their intended effect: SGI's stock remained artificially inflated long enough for the officers to profit from massive and improper insider trading.

Although Brody's complaint suggests an inference of deliberate recklessness, it lacks sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA. For example, Brody fails to state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom she obtained the information. In short, Brody's complaint is not sufficiently specific to raise a strong inference of deliberate recklessness. As the district court recognized, mere boilerplate pleadings [13] will rarely, if ever, raise a strong inference of deliberate recklessness or otherwise satisfy the PSLRA's particularity requirement. The district court also concluded that the sales of stock were not so suspicious as to create a strong inference of deliberate recklessness. We agree with the district court. For purposes of explanation, we examine in detail the bases for Brody's allegations.

### 1. *Internal reports*

Brody alleges that SGI's internal reports [14] alerted the officers to serious production and sales problems. According to Brody, the Flash reports, Financial Statements/Packages and Stop Ship reports announced that: (1) SGI was not shipping the Indigo2 workstation in volume; (2) North American and European sales remained slow; and (3) SGI would not meet its revenue and growth targets for FY96. Brody contends that the reports notified the officers that SGI was suffering "weak North American sales due to continuing problems with its North American direct sales force" and "a very poor Oct., with revenues, net income and earnings

13. The district court notes that "[o]ther complaints recently filed by plaintiff's counsel illustrate this problem. The Court takes judicial notice of five securities class action complaints filed in United States District Courts that contain the same boilerplate allegations of 'negative internal reports' found in paragraph thirty of the complaint in this case." No. C 96–0393–FMS, at 26 n.11.

14. SGI routinely produces at least three types of internal status reports: (1) daily reports; (2) monthly financial reports; and (3) "Stop Ship" reports. The daily reports include manufacturing, sales, and financial data. Monthly reports are broken down into "Flash Reports," which are prepared immediately at the end of the month and which summarize the company's performance, and "Monthly Financial Statements/Packages," which are more detailed reports that SGI distributes within ten days of the close of the month. "Stop Ship" reports notify upper management of manufacturing problems and their likely effect on volume shipments.

per share well below forecasted and budgeted levels."

According to Brody, the officers conducted several meetings during which they entered into a "conspiracy of silence" whereby they agreed to downplay the seriousness of the company's problems. However, Brody does not plead facts to corroborate her allegations. Instead, she merely provides a list of sources from which she allegedly obtained her information. The boilerplate section of her complaint, titled "Basis of Allegations," states that:

> Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations [ ] after a reasonable opportunity for discovery.

■ This paragraph is an insufficient basis for fraud allegations because it fails to state "with particularity all facts on which [her] belief is formed." *See* 15 U.S.C. § 78u–4(b)(1). This means that a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim. In this case, Brody's complaint does not include adequate corroborating details. She does not mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents which we believe-if they did exist-would include countless specifics regarding ASIC chip shortages, volume shortages, negative financial projections, and so on. We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well

as such facts as may indicate their reliability.

In the absence of such specifics, we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of SGI's problems that would cause their optimistic representations to the contrary to be consciously misleading. In other words, in the absence of such specifics, we cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made-a required element in pleading fraud. *See, e.g., Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). Brody would have us speculate as to the basis for the allegations about the reports, the severity of the problems, and the knowledge of the officers. We decline to do so.

Brody is required to state facts giving rise to a strong inference of deliberate recklessness or intent. It is not enough for her to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness. The PSLRA requires, to repeat, that Brody state with particularity facts giving rise to a strong inference of the required state of mind, i.e., at least deliberate recklessness. *See* 15 U.S.C. § 78u–4(b)(2). We understand this to mean that Brody must plead in great detail facts demonstrating, at a minimum, a degree of recklessness that strongly suggests the required degree of intent. While we hold that the unsubstantiated internal reports alone are insufficient to demonstrate such recklessness, we cannot yet answer the larger question of whether Brody's complaint, considered in its entirety, states facts which give rise to a strong inference of deliberate recklessness. Accordingly, we turn to the allegedly suspicious stock sales.

### 2. *Stock sales*

Brody alleges that six individual officers engaged in massive insider trading during the fifteen-week class period, collectively

selling 388,188 shares of stock totaling $13,821,053 in proceeds. The district court determined that although two of the individual defendants' sales were suspicious, the allegations overall failed to raise a strong inference of deliberate recklessness. We agree that the allegations fail to raise the required strong inference.

■ Although "unusual" or "suspicious" stock sales by corporate insiders may constitute circumstantial evidence of scienter, see Provenz, 102 F.3d at 1491,[15] insider trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989). Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. See, e.g., Provenz, 102 F.3d at 1491.

Brody argues that the district court erred in concluding that the officers' sales of SGI stock during the class period did not give rise to a strong inference of fraudulent intent. Specifically, she contends that the district court (1) improperly considered SEC filings in ruling on the motion to dismiss; (2) improperly treated the officers' stock options as stock shares for purposes of evaluating their stock sales; and (3) erroneously concluded that the officers' stock sales were not unusual or suspicious. We address each argument in turn.

■ First, we disagree and hold that it was proper to consider the SEC filings under the incorporation by reference doctrine. That doctrine permits a district court to consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." Branch v. Tun-

nell, 14 F.3d 449, 454 (9th Cir.1994). In this case, Brody alleges the contents of the SEC filings in her complaint. She states that her allegations are based in part on a review of SGI's SEC filings, and she clearly gleaned from the SEC Form 3 and 4 filings many of the facts regarding the officers' stock sales. Although Brody questions the veracity of the SEC forms, her ongoing and substantial reliance on the forms as a basis for her allegations substantially weakens her position. As the district court pointed out, "[h]aving raised questions about [officers'] stock sales, based [her] allegations on [officers'] SEC filings, and submitted expert declarations that rely on the SEC forms at issue, [Brody] can hardly complain when [the officers] refer to the same information in their defense." The district court did not err in considering SGI's SEC filings in ruling on the motion to dismiss.

■ Second, Brody argues that it was improper for the district court to consider the officer's vested stock options in evaluating the proper proportions of their stock sales. Brody contends that because vested stock options are not shares, they should not be treated as such for the purpose of calculating the percentage of shares that each officer sold. We disagree. When evaluating stock sales, we have held that the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious. See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427 (9th Cir.1994); see also Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995). In this case, we see no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately.[16] Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the

---

15. Citing In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir.1989). See also In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427 (9th Cir.1994).

16. Ours is a case in point. Virtually all of the shares sold by the officers in this case, were originally vested stock options that were converted to shares and then immediately sold.

stock shares alone. Therefore, a sale involving a significant portion of an insider's actual shares, but only a small portion of his shares and options combined, is less suspicious than were the insider to hold no options.[17] The district court did not err in treating the officers' stock options as shares of stock for purposes of evaluating the suspiciousness of their stock sales.

Third, we reject Brody's contention that the district court erroneously concluded that the officers' stock sales were not unusual or suspicious. This Court has recognized that only "[i]nsider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter." *Apple Computer*, 886 F.2d at 1117. Insider trading is suspicious when "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Id.* In this case, we conclude that the stock trading was not dramatically out of line with prior trading practices or otherwise suspicious enough to create a strong inference of the required deliberate recklessness.

■ All but two of the officers in this case sold a relatively small portion of their total holdings and traded in a manner consistent with prior practice. Collectively, the officers-even including the two who sold the greatest percentage of their holdings-retained 90 percent of their available holdings. President McCracken sold just 2.6 percent of his holdings and options. Vice President Baskett sold 7.7 percent. Senior Vice Presidents Ramsay and Sekimoto sold 4.1 and 6.9 percent, respectively. Senior Vice President Kelly's and Burgess's sales appear somewhat suspicious-they sold 43.6 and 75.3 percent of their respective holdings.

■ However, we hold that even Kelly's and Burgess's sales fail to give rise to a strong inference of deliberate recklessness on the part of them or other directors. Kelly sold 43.6 percent of his shares and options during the class period, but his sales represent an insignificant portion of the allegedly suspicious sales. Of the 388,188 shares with which Brody is concerned, only 20,000 were sold by Kelly. In other words, his sales amount to just five percent of the total stock sales with which Brody is concerned. And although Kelly had never before sold such a large quantity of stock, he had only been with SGI for a year and had no significant trading history for purposes of comparison. In light of the relatively low percentage of holdings sold by the other officers, Kelly's relatively insignificant trading activity alone does not give rise to a strong inference of deliberate recklessness.

■ Burgess, on the other hand, sold a vast quantity of shares. His 250,588 shares sold represent sixty-five percent of the sales with which Brody is concerned. In fact, in the absence of Burgess's sales, the officers' sales activity during October 1995 would have looked much more like any other month. Burgess's sales, in other words, *appear* extremely significant for purposes of Brody's class action. However, they are not. Brody overlooks crucial facts pertaining to Burgess's sales. Brody states that "Burgess had never before sold any of his SGI stock"; however, she omits mention of the fact that SGI acquired his Toronto company, Alias, Inc., in June 1995, and that he was legally forbidden to trade his new SGI stock until the second quarter of 1995, which embraced the period in which his sales occurred. Nor does Brody mention that Burgess remained in Toron-

---

17. Citing *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir.1995), Brody argues that courts disregard stock options in determining whether insider trading is suspicious or unusual. However, Brody's reliance on *Fecht* is misguided. *Fecht* does not broadly prohibit courts from considering stock options. Rather, this Court in *Fecht* concluded that the defendants' sale of a significant portion of their actual stock holdings in the company was suspicious, but did not indicate whether the volume of stock sold was substantial in light of any vested options they possessed. *See id.* at 1084. Moreover, the Second Circuit recently considered the defendants' stock options in evaluating allegations of insider trading. *See Acito*, 47 F.3d at 54.

to, in charge of Alias, Inc., without any day-to-day contact with SGI's officers or involvement in its operations. Moreover, Burgess—unlike Kelly—did not make any of the allegedly misleading statements. Under these circumstances, Burgess's stock sales do not give rise to a strong inference of deliberate recklessness.

### 3. Summary: No strong inference of deliberate recklessness

■■■ Brody's allegations are insufficient to create a strong inference that the officers acted with at least deliberate recklessness. Her complaint does not create a strong inference of deliberate recklessness or knowing misrepresentation on the part of the defendants. It is too generic and contains little more than evidence of mere motive and opportunity to commit fraud. Her assertions in the complaint differ very little from the conjectures of many concerned and interested investors. At one time, an immensely successful company and its officers state publicly that the company will continue to succeed. The officers then sell a noticeable quantity of shares at a considerable profit. Shortly thereafter, the company takes a turn for the worse and suddenly, suspicion abounds. See, e.g., DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990) ("The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud."). In the absence of greater particularity and more incriminating facts, we have no way of distinguishing Brody's allegations from the

countless "fishing expeditions" which the PSLRA was designed to deter. See H.R. CONF. REP. 104–369, at 37.

Congress enacted the PSLRA to put an end to the practice of pleading "fraud by hindsight." See e.g., Medhekar v. United States Dist. Ct., 99 F.3d 325, 328 (9th Cir.1996) (holding that Congress intended for complaints under the PSLRA to stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed).[18] As the district court pointed out, "[e]very sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts; allowing Brody to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped."[19] We conclude that Brody's general allegations regarding negative internal reports and stock sales do not give rise to a strong inference of deliberate recklessness. This properly serves the PSLRA's purpose of establishing "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits." H.R. CONF. REP. 104–369, at 41.

### 4. Summary Judgment

In addition to dismissing the entire complaint, the district court granted summary judgment to individual officers Baskett, Burgess, Ramsay and Sekimoto based upon their declarations stating that they were not involved in any of the misrepresentations alleged by Brody. Brody argues that this summary judgment was improper because she was prevented by a discovery stay from securing evidence nec-

---

**18.** See also San Leandro Emergency Med. Group v. Philip Morris Co., Inc., 75 F.3d 801, 812–13 (2d Cir.1996) (holding that plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss because the allegations appeared to have been cobbled together in hindsight).

**19.** No. C 96–0393–FMS, at 26 (N.D.Cal. Sept. 26, 1996). See also O'Neal Trust v. Vanstar

Corp., No. C 98–0216–MJJ, slip op. at 7–8 (N.D.Cal. Dec. 22, 1998) (dismissing complaint containing boilerplate language identical to the language in this complaint); Berger v. Ludwick, No C 97–0728–CAL, slip op. at 4–5 (N.D.Cal. Sept. 15, 1998) (following In re Silicon Graphics, Inc. Sec. Litig., 970 F.Supp. 746 (N.D.Cal.1997)); Novak v. Kasaks, 997 F.Supp. 425, 431 (S.D.N.Y.1998) (dismissing complaint containing boilerplate language identical to the language in this complaint).

essary to oppose the motion for summary judgment. Alternatively, she contends that the officers failed to show that there was no triable issue of fact as to her fraudulent statement claim. We reject both arguments.

Brody was subject to a mandatory discovery stay, *see* 15 U.S.C. § 78u–4(b)(2), when the district court entered summary judgment against her. Brody claims that the stay should have been lifted in order to permit her to engage in discovery prior to the decision on the motion for summary judgment. The district court may permit discovery, and continue a summary judgment hearing, when a party is otherwise unable to present "facts essential to justify his opposition," and offers an explanation of why this inability exists. *See* Fed. R.Civ.P. 56(f). "Rule 56(f) requires affidavits setting forth the particular facts expected from the movant's discovery," *Brae Transp., Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir.1986), and specifying "how [those facts] would preclude summary judgment," *Garrett v. City and County of S.F.,* 818 F.2d 1515, 1518 (9th Cir.1987).

■■■ Brody failed to comply with Rule 56(f). "Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment." *Brae,* 790 F.2d at 1443. In this case, Brody failed to file a motion seeking discovery [20] or even explain why discovery was necessary. She also failed to file the required affidavit detailing with particularity the information she hoped to obtain by discovery. In short, she neglected to comply with either of the core requirements of Rule 56(f). Therefore, notwithstanding the discovery stay, it was proper for the district court to proceed to the merits of summary judgment.

We also agree with the district court's conclusion that the evidence offered by the individual officers was adequate to support summary judgment. Baskett, Burgess, Ramsay, and Sekimoto submitted uncontested affidavits that they neither participated in the preparation of any of the written statements nor made any of the oral statements challenged by Brody. She offers no evidence to the contrary. Thus, the individual officers negated the factual basis for Brody's claim. Summary judgment was proper.

## B.

### The Sufficiency of Janas' Complaint

Janas, to repeat, filed a derivative suit against SGI and the individual officers making virtually the same allegations as Brody. Janas contends that SGI's officers breached their fiduciary duties to SGI, were grossly negligent in managing the company, and engaged in improper insider trading. After consolidating the Janas and Brody cases, the district court dismissed Janas's claims because he failed to make and allege a pre-suit demand on SGI's board of directors as required under the rules governing derivative suits. The district court held that it would not have been futile for Janas to make such a demand, and dismissed the complaint without leave to amend. We hold that the district court did not abuse its discretion in finding that a pre-suit demand would not have been futile. We also hold that it was proper to dismiss the suit without leave to amend.

### 1. *Failure to make demand*

■■■ A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile. *See* Fed. R.Civ.P. 23.1. Rule 23.1, however, does

---

20. Nonetheless, she insists that the district court should have construed her motion striking the affidavits in support of officers' motion for summary judgment as a motion seeking discovery, and granted it. Brody's argument is futile, however, because even if her papers are treated as a motion seeking discovery, they fail to comply with the particularity requirement of Rule 56(f).

not establish the circumstances under which demand would be futile. *See Kamen v. Kemper Fin. Serv., Inc.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991). For these standards, we turn to the law of the state of incorporation; in this instance, Delaware. To show futility under Delaware law, a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *See Aronson v. Lewis,* 473 A.2d 805, 814 (Del. 1984). Janas claims that he alleges facts sufficient under either theory. We are not persuaded. We address his two arguments in turn.

### a. *Independent and disinterested*

Janas insists that he created a reasonable doubt as to the independence and disinterestedness of SGI's officers by averring that (1) the Board engaged in a fraudulent scheme to inflate the value of SGI stock and facilitate profitable insider trading; (2) Board members benefitted from the inflated value of SGI stock; and (3) officer McCracken dominated the Board. We disagree.

 At the pleading stage, Board independence and compliance with the business judgment rule are presumed. *See id.* at 815. Demand will be excused only if the plaintiff's allegations show the defendants' actions "were so egregious that a substantial likelihood of director liability exists." *Id.* "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Id.*

 Janas fails to plead particular facts showing that the directors' actions were so egregious that they faced a significant threat of liability. He fails to provide specific facts showing that the Board approved the stock repurchasing plan to inflate SGI's stock price artificially, or that the Board approved the alleged insider trading or the allegedly fraudulent state-

ments. Indeed, his claim rests on a general allegation that the Board participated in the fraudulent scheme. Such general allegations are insufficient to demonstrate that the Board engaged in conduct that resulted in a substantial risk of personal liability. *Accord Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (holding that plaintiff's general allegation that the directors "looked the other way" when the board's chairman engaged in misconduct did not show "substantial likelihood of liability").

Moreover, Janas fails to plead facts demonstrating that Board members benefitted from the inflated value of SGI stock. Janas alleged that only two out of nine directors sold SGI stock during the class period. As to the allegation that McCracken dominated the Board, Janas advances no particularized facts to rebut the presumption that the individual directors were independent. Therefore, the district court did not abuse its discretion in concluding that Janas failed to establish a reasonable doubt that the majority of the Board was independent and disinterested.

### b. *Business judgment rule*

 Plaintiffs can also demonstrate the futility of a pre-suit demand by creating a reasonable doubt as to whether the challenged conduct is protected by the business judgment rule. Under the business judgment rule, directors are presumed to make sound business decisions, and to inform themselves properly prior to making those decisions. *See Grobow v. Perot,* 539 A.2d 180, 189 (Del.1988). As discussed, Janas has not pleaded with particularity facts showing that the Board approved, acquiesced in, or otherwise supported the alleged false statements or the allegedly improper insider trading of SGI stock. He has not stated facts that demonstrate that the Board intended for the stock repurchase plan to inflate artificially the value of SGI stock in order to facilitate insider trading. In the absence of such facts, we must presume that the Board had a legitimate business purpose when it repurchased SGI stock.

In sum, the district court did not abuse its discretion in concluding that Janas failed to raise a reasonable doubt as to the soundness of the Board's business judgment. Accordingly, Janas was not excused from the pre-suit demand requirement.

### 2. Dismissal without leave to amend

██ Finally, we must determine whether the district court erred in dismissing Janas's derivative action without granting him leave to amend. We have held that "[d]ismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Polich*, 942 F.2d at 1472. Here, Janas has failed to set forth any facts which he could add to save his complaint. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993) (denying leave to amend when plaintiffs failed to allege additional facts which might cure defects in complaint). Moreover, we hold that it is clear that Janas could not have amended his complaint to show that it would have been futile to make a demand upon the directors. As a result, we hold that dismissal with prejudice was appropriate.

### V.

### CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in dismissing Brody's complaint, granting summary judgment to the individual officers, and dismissing Janas's complaint without leave to amend.

AFFIRMED.

### AMENDED CONCURRING AND DISSENTING OPINION

Aug. 25, 1999.

BROWNING, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's holding that (1) the Private Securities Litigation Reform Act (the "Reform Act") eliminated recklessness and motive and opportunity to commit fraud as bases for establishing scienter under § 10(b) and Rule 10b-5, and (2) the allegations of scienter in Brody's complaint were insufficient to survive a motion to dismiss.[1] Congress plainly intended the Reform Act to raise the pleading standard by requiring plaintiffs to allege facts raising a "strong inference" of scienter, rather than permitting plaintiffs (as this circuit did) to plead scienter "simply by saying that scienter existed," *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir.1994) (en banc), but did not intend to restrict the evidentiary bases from which the inference of scienter might be drawn. By holding to the contrary, the majority raises the pleading bar higher than that envisioned by Congress, and places the Ninth Circuit at odds with both the Second and Third Circuits.

### I.

### The Reform Act

The Reform Act requires plaintiffs to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2). Although the majority concedes that "[t]he plain text of the [Reform Act] leaves it open for us to consider circumstantial evidence of recklessness and motive and opportunity as evidence of [scienter]," *ante*, at 977, it concludes that the legislative history of the Act establishes that allegations either of recklessness (a term the majority refers to as "mere recklessness" or "simple recklessness," *ante* at 974) or of motive and opportunity to commit fraud are no longer sufficient to avoid dismissal, *see ante*, at 979–80.

Some courts addressing the issue have also reached a similar conclusion.[2] Other

---

1. I concur in two parts of the majority opinion: section IV(A)(4) (affirming summary judgment in favor of Baskett, Burgess, Ramsay, and Sekimoto) and section IV(B) (affirming the dismissal of Janas' complaint).

2. *See, e.g., Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997);

courts have held allegations of motive and opportunity to defraud are not sufficient to support the required inference of scienter, but have stopped short of eliminating allegations of recklessness as a basis for such an inference.[3] A third line of cases, led by the Second Circuit in which the "strong inference" standard originated, have held that allegations of recklessness or motive and opportunity are sufficient to satisfy the "strong inference" standard. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999).[4]

The latter approach begins and ends with the plain text of the statute. The statute nowhere mentions proof of motive and opportunity to commit fraud or any other specific means of establishing scienter, but simply requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). There is no support in the text for concluding that proof of recklessness[5] or motive and opportunity to commit fraud[6] are not sufficient to meet the "strong inference" standard.

The majority concedes as much, but nonetheless resorts to legislative history because the language of the statute "does not indicate whether [allegations of recklessness or motive and opportunity] alone are enough to establish a 'strong inference' of [scienter]." *Ante*, at 977. In effect, the majority holds that the breadth and flexibility of the Reform Act's unambiguous pleading standard are sufficient to justify departure from the statute's plain text. Respectfully, that thesis is not supportable. As the Court stated in *Barnhill v. Johnson*, 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), "[A]ppeals to statutory history are well taken only to resolve 'statutory ambiguity.'" *See also Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotations omitted)).[7]

Even if it were appropriate to reach beyond the plain text, the Reform Act's legislative history does not support the majority's interpretation. Although Congress clearly intended to adopt the Second Circuit's "strong inference" standard, the legislative history taken as a whole does not suggest that Congress intended to reject the Second Circuit's holdings that alle-

---

*Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42, 49–50 (D.Mass.1997).

**3.** *See, e.g., In re: Comshare, Inc. Sec. Litig.*, 183 F.3d at 548–49 (6th Cir.1999); *Malin v. IVAX Corp.*, 17 F.Supp.2d 1345, 1356–57 (S.D.Fla.1998).

**4.** *See also, e.g., In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192, 201 (E.D.N.Y. 1997); *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997).

**5.** "Recklessness" involves "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (quoting *Sundstrand Corp. v. Sun*

*Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

**6.** The Second Circuit defines "motive and opportunity" as follows: "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994).

**7.** *See also In re Catapult Enter., Inc.*, 165 F.3d 747, 753 (9th Cir.1999) ("[B]ecause we discern no ambiguity in the plain statutory language, we need not resort to legislative history."); *United States v. Phelps*, 895 F.2d 1281, 1283 (9th Cir.1990) (Kozinski, J., dissenting from order denying petition for rehearing en banc) ("In deciding whether it is appropriate to go beyond statutory language, the touchstone is not breadth but ambiguity[.]").

gations of recklessness or of motive and opportunity to defraud could satisfy that standard.

The majority contends that the Conference Committee "implicitly rejected" motive, opportunity, and recklessness as bases for a "strong inference" of fraud by eliminating language incorporated in the bill in the Senate by the Specter Amendment, which purported to codify all aspects of the Second Circuit's case law applying the "strong inference" standard. *Ante*, at 978. The legislative history suggests, however, that the Committee rejected language added by the Specter Amendment because it was "an incomplete and inaccurate codification" of Second Circuit case law,[8] not because the Committee intended to restrict the ways in which a "strong inference" of scienter might be shown. Indeed, supporters of the defeated Specter Amendment were assured that while the Reform Act did not expressly provide that plaintiffs could plead scienter based on recklessness or motive and opportunity to defraud, "the guidance [provided by Second Circuit case law] is still going to be there." 141 Cong. Rec. S19071 (daily ed. Dec. 21, 1995) (statement of Sen. Dodd).[9]

Moreover, the Specter Amendment's codification of a specific test for pleading scienter would have been inconsistent with the provisions of the Reform Act requiring a different state of mind for different statements. Under the Reform Act's "safe harbor" provisions, plaintiffs must prove that "forward-looking" statements were made with "actual knowledge" that they were false or misleading. 15 U.S.C. §§ 78u–5(c)(1)(B), 77z–2(c)(1)(B). A recklessness standard for pleading that would apply to *all* statements, such as that proposed in the Specter Amendment, would have been inconsistent with the safe harbor's requirement of "actual knowledge" for forward-looking statements.

The majority relies on a statement in the Conference Report that "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.... For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." H.R. Conf. Rep. 104–369, at 41 & n. 23 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740, 747 n. 23. The majority infers from this comment that Congress intended to impose a "more stringent" standard than that of the Second Circuit by rejecting the sufficiency of allegations of motive and opportunity and circumstantial evidence of recklessness to establish a "strong inference" of scienter. *Ante*, at 978. The more plausible and direct explanation is that Congress chose

---

**8.** 141 Cong. Rec. S19067 (daily ed. Dec. 21, 1995) (Sen. Dodd quoting from memorandum of Prof. Grundfest); *see also* 141 Cong. Rec. S17960 (daily ed. Dec. 5, 1995) (statement of Sen. Dodd) ("The Senator's amendment adopted the guidance of the [S]econd [C]ircuit, but the amendment ... completely omits a critical qualification in the case law. The courts have held that 'where motive is not apparent, a plaintiff may plead scienter by identifying circumstances' indicating wrongful behavior, but 'the strength of the circumstantial allegations must be correspondingly greater' from the number of cases."); 141 Cong. Rec. S19068 (daily ed. Dec. 21, 1995) (statement of Sen. Dodd) ("The Specter amendment ... did not really follow the guidance of the [S]econd [C]ircuit. So that is the reason that amendment was taken out.... But the suggestion that the standard and-the

guidance, rather, was included in the Specter amendment, omits-omits that where a motive is not apparent, the strength of circumstantial allegations must be correspondingly greater. That was omitted.").

**9.** *Accord* 141 Cong. Rec. S19068 (daily ed. Dec. 21, 1995) (statement of Sen. Dodd) ("We have left out the guidance. That does not mean you disregard it."); *see also* H.R. Conf. Rep. 104–369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740 ("The Conference Committee language is based in part on the pleading standard of the Second Circuit."); S. Rep. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694 ("The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.").

not to include language relating to these specific modes of proving the required intent to defraud because it was concerned only with adopting the Second Circuit's pleading standard, not with adopting (or rejecting) particular factual patterns that might satisfy that standard. That task was left to the courts. *See Advanta*, 180 F.3d 525, 1999 WL 395997, at *16 n. 8 ("[I]f Congress had desired to eliminate motive and opportunity or recklessness as a basis for scienter, it could have done so expressly in the text of the Reform Act. In our view, the fact that Congress considered inserting language directly addressing this line of cases, but ultimately chose not to, suggests that it intended to leave the matter to judicial interpretation.").[10]

Congress also declined to include in the Reform Act language relating to a variation of the second method of meeting the Second Circuit's standard (by alleging and proving "circumstantial evidence of conscious misbehavior"[11]), but the majority does not suggest that because of this omission conscious misbehavior no longer provides an appropriate basis for inferring scienter. Indeed, the majority's own "deliberate or conscious recklessness" test focuses on conscious misbehavior. *See ante,* at 979–80.

The majority relies heavily upon the fact that in announcing his reasons for vetoing the Reform Act, the President expressed his concern that the legislation would elevate the pleading standard above that previously adopted in the Second Circuit. The majority argues that by overriding the President's veto, "Congress provided powerful evidence of its intent to elevate the pleading standard to a level beyond that in the Second Circuit." *Ante,* at 979. This argument rests on the assumption that Congress, in overriding the President's veto, agreed with the President that the Reform Act, as passed by Congress, adopted a pleading standard more demanding than the Second Circuit's standard. During Senate debate on overriding the President's veto, however, the sponsors of the bill explicitly disagreed with the President's interpretation and reaffirmed their own view that, contrary to the President's belief, the Reform Act's pleading standard was "faithful to the Second Circuit's test." 141 Cong. Rec. S19067 (daily ed. Dec. 21, 1995) (Sen. Dodd quoting from memorandum of Prof. Grundfest).[12]

Other provisions of the Reform Act undermine the majority's holding, particularly the majority's across-the-board elimination of "mere" recklessness as a basis of liability. Before the Reform Act was

10. *See also, e.g.,* 141 Cong. Rec. S17960 (daily ed. Dec. 5, 1995) (statement of Sen. Dodd) ("[I]nstead of trying to take each case that came under the [S]econd [C]ircuit, we are trying to get to the point where we would have well-pleaded complaints. We are using the standards in the [S]econd [C]ircuit in that regard, then letting the courts-as these matters will-test. They can then refer to specific cases, the [S]econd [C]ircuit, otherwise, to determine if these standards are based on facts and circumstances in a particular case.").

11. *Press,* 166 F.3d at 538 ("As a pleading requirement, a plaintiff must either (a) allege facts to show that 'defendants had both motive and opportunity to commit fraud' or (b) allege facts that 'constitute strong circumstantial evidence of *conscious misbehavior* or recklessness.'" (emphasis added) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994))).

12. *Accord* 141 Cong. Rec. S19150 (daily ed. Dec. 22, 1995) (statement of Sen. Domenici) ("The President objected to the pleading standard. Yet it is the Second Circuit's pleading standard."); 141 Cong. Rec. S19,068 (daily ed. Dec. 21, 1995) (statement of Sen. Dodd) (the Reform Act "met the [S]econd [C]ircuit standard"); *see also* 141 Cong. Rec. H15219 (daily ed. Dec. 20, 1995) (statement of Rep. Lofgren) ("The President says he supports the [S]econd [C]ircuit standard for pleading. So do I. That is what is included in this bill."); 141 Cong. Rec. H15218 (daily ed. Dec. 20, 1995) (statement of Rep. Moran) ("We know we are going to have the Second Circuit standard applied, and that in fact when legislation is at variance with legislative history or report language, that it is the bill itself that prevails.").

adopted, every court of appeal addressing the issue, including this one, had concluded that recklessness [13] satisfied section 10(b)'s scienter requirement. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 & n. 6 (9th Cir.1990).[14] When Congress intended to proscribe liability for recklessness in the Reform Act, it did so explicitly. As noted, the standard of liability for "forward-looking" fraudulent statements in the Reform Act's "safe harbor" provisions requires plaintiffs to allege that such statements were made with "actual knowledge" of falsity. *See* 15 U.S.C. §§ 78u–5(c)(1)(B), 77z–2(c)(1)(B). Similarly, the provisions governing proportionate liability provide that joint and several liability is to be imposed only if the plaintiff has shown that the defendant "knowingly committed a violation of the securities laws," 15 U.S.C. § 78u–4(g)(2)(A), a term which Congress expressly defined to *exclude* "reckless conduct," 15 U.S.C. § 78u–4(g)(10)(B). These provisions suggest that if Congress had intended to proscribe liability for recklessness in other circumstances it would have done so directly.[15]

The Securities and Exchange Commission is uniquely qualified to assess "the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability[.]" *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n. 10, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (giving deference to the SEC's interpretation of Rule 14a–9). The Commission "often relies on the recklessness standard in its own law enforcement cases,"[16] and argues forcefully that the Reform Act did not eliminate recklessness as a basis for liability generally. In the Commission's view, liability for recklessness is "essential to the effective functioning of Section 10(b)," and "necessary to protect investors and the integrity of the disclosure process."[17] The Commission's amicus brief states:

> Construing the Reform Act's pleading standard provision as eliminating recklessness would convert what was intended to be a procedural provision into a substantive change in the definition of scienter. It would, in effect, eliminate recklessness (in private actions) from the uniformly accepted definition of scienter. Because the substantive law allows *liability* for recklessness, it follows that plaintiffs must be allowed to

---

13. In *Hollinger,* this court adopted the Seventh Circuit's widely-accepted definition of recklessness: " '[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Hollinger,* 914 F.2d at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)). By adopting a definition of recklessness accepted by a majority of circuits, the en banc court intended "to bring greater uniformity to the law of the various circuits." *Id.* at 1569 n. 7. The majority departs from *Hollinger's* holding by displacing our pre-Reform Act definition of recklessness (a term the majority refers to as "simple recklessness" or "mere recklessness," *ante* at 974) with a new and untested "deliberate recklessness" standard. *Ante* at 977. This holding undermines *Hollinger's* attempt to establish a uniform defini-

tion of recklessness, and places the Ninth Circuit squarely at odds with the Third and Sixth Circuits, both of which have held that the Reform Act did *not* eliminate liability for recklessness and did *not* alter the definition of that term. *See Comshare,* 183 F.3d at 549–50 & 551 n. 8; *Advanta,* 180 F.3d at 535; *see also Press,* 166 F.3d at 538.

14. *See also Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978) (per curiam) ("Although the Supreme Court left undecided the question whether recklessness is sufficient to support liability under Rule 10b–5, distinguished jurists have long considered it so.").

15. *See Advanta,* 180 F.3d at 534 n. 8 ("[I]f Congress had desired to eliminate motive and opportunity or recklessness as a basis for scienter, it could have done so expressly in the text of the Reform Act.").

16. Brief of Amicus SEC at 21.

17. Brief of Amicus SEC at 17, 20.

*plead* that the defendants acted recklessly. If plaintiffs can state with particularity facts giving rise to a strong inference that defendants acted recklessly, their complaint is sufficient under the Reform Act.

Brief of Amicus SEC at 18–19 (emphases in original).[18] The Commission's rationale is shared by the Third Circuit, which recently stated: "Retaining recklessness not only is consistent with the Reform Act's expressly procedural language, but also promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." *Advanta,* 180 F.3d 525, 534–35.

The Senate Report stated that "[t]he Committee does not adopt a new and untested pleading standard that would generate additional litigation." [19] The pleading standard proposed by the majority, however, would require plaintiffs to plead "deliberate or conscious recklessness," a formulation not found in the text of the statute, in the legislative history, or in any case heretofore litigated, and rejected by the responsible administrative agency; it would eliminate recklessness as a basis for liability, and treat allegations of motive and opportunity to commit fraud as insufficient to allege scienter. It is "new," "untested," and certain to "generate additional litigation."

## II.

### Brody's Complaint

The Reform Act, properly interpreted, permits plaintiffs to plead a strong inference of scienter by alleging with particularity facts that constitute circumstantial evidence of reckless or conscious misbehavior, or a motive and opportunity to defraud. Brody's complaint satisfies this standard by setting forth, in adequate detail, the factual basis for a strong inference that Silicon Graphics, Inc. ("SGI" or "the Company") and its officers knowingly or recklessly misrepresented the state of the Company's affairs and, as evidenced by the individual defendants' insider stock sales, had the motive and opportunity to defraud. Dismissal is not warranted because it does not "appear[ ] beyond doubt that plaintiff can prove *no* set of facts in support of [her] claim which would entitle [her] to relief," *Neubronner v. Milken,* 6 F.3d 666, 669 (9th Cir.1993) (emphasis added, internal quotations omitted), even under the majority's "deliberate recklessness" standard.

### 1.

### Particularity

Before considering whether they support a "strong inference" of fraud, the court must assess the particularity of Brody's allegations. Federal Rule of Civil Procedure 9(b) provides that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The Reform Act modifies this requirement, providing that a securities fraud complaint shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1). Brody satisfies each requirement.

Brody alleged that during the class period-September 13, 1995 to December 29, 1995-SGI and the individual defendants made material misrepresentations regarding the condition of the Company in order to inflate the price of its stock and facili-

**18.** *See also* Richard H. Walker & J. Gordon Seymour, *Recent Judicial and Legislative Developments Affecting the Private Securities Fraud Class Action,* 40 Ariz. L.Rev. 1003, 1027–28 (1998) ("[N]either the Reform Act nor its legislative history reflects any intention to eliminate recklessness as a basis of liability. The recklessness standard has long been rec-ognized by the federal courts and is essential to investor protection.").

**19.** S. Rep. 104–98, at 15 (1995) (Report of Senate Committee on Banking, Housing and Urban Affairs), *reprinted in* 1995 U.S.C.C.A.N. 679, 694.

tate profitable insider trading. Brody challenged eleven allegedly misleading statements made by officers of SGI,[20] described the content of each, and either named the individuals who made the statements, or identified them with enough specificity to permit SGI to determine the source. Thus, Brody has given the defendants adequate notice of the specific instances of alleged fraud grounding her complaint to permit them to respond. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (2d ed. 1990) ("Perhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading.").

Brody also adequately pled facts showing why these eleven statements were false when made, alleging "specific problems undermining a defendant's optimistic claims[.]" *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir.1995). The statements challenged by Brody can be grouped into three categories: (1) statements assuring investors that there were no problems with the production and distribution of SGI's improved line of graphic design computers called the "Indigo2 Impact Workstation" ("Indigo2"); (2) statements acknowledging sluggish sales in North America and Europe, but downplaying their significance; and (3) statements predicting SGI would meet its goal of 40% growth for Fiscal Year 1996. Brody's complaint pleads facts that conflict with each of these categories of statements, alleging that confidential SGI reports informed officers as early as September 1995 that: (1) SGI was encountering difficulty securing enough components to produce Indigo2 workstations in volume; (2) SGI continued to experience sluggish sales in North America and Europe; and (3) these problems made it impossible for SGI to meet its annual or

**20.** (1) September 13, 1995: SGI CEO Edward McCracken told Morgan Stanley that there were "no supply constraints" on the production of an improved line of graphic design computers called the "Indigo2 Impact Workstation" ("Indigo2"); (2) September 21, 1995: McCracken announced at a computer conference that sales growth was "accelerating"; (3) September 22, 1995: McCracken told Morgan Stanley there was "no problem with [the Indigo2], nor is there an engineering halt"; (4) September 26, 1995: SGI announced "volume shipments" of the Indigo2; (5) October 19, 1995: SGI issued a press release announcing 33% revenue growth, and reporting that the Indigo2 was shipping in volume; (6) October 19, 1995: SGI held a conference call during which McCracken and other executives told securities analysts and institutional investors SGI had not met its goal of 40% revenue growth during the first quarter of fiscal year 1996. SGI executives explained that the reorganization of its sales force temporarily hurt sales, but the reorganization had been successful. The executives also attributed the shortcoming to a drop in North American and European orders. SGI assured investors that (a) there were no manufacturing problems with or supply constraints on the Indigo2; (b) demand was strong for the workstation, and it was being shipped in volume; and (c) the revenue target of 40% for Fiscal Year 96 would be achieved; (7) October 19, 1995: McCracken stated in an interview that SGI's first quarter growth was "probably less" than the growth the Company would see during Fiscal Year 1996; (8) November 2, 1995: SGI executives held a press conference for securities analysts and investors, stating that (a) SGI would still achieve its goal of 40% revenue growth, and its second quarter performance should better its first quarter performance; (b) the failure to meet growth expectations for the first quarter resulted from temporary sales force reorganization problems and a temporary drop in sales; and (c) Indigo2 sales were beating expectations, and the product was now shipping in volume after some initial problems with the supply of a key chip component; (9) Early November, 1995: SGI's first quarter report to shareholders included a letter from McCracken stating that the Indigo2 "began shipping in volume in September"; (10) December 15, 1995: McCracken and another SGI executive told Dean Witter that (a) SGI had a strong November; (b) sales force productivity was improving; (c) European and North American sales were likely to improve; and (d) the Company would meet its goal of 40% growth for the second quarter; (11) Mid–December, 1995: McCracken and another SGI executive told Smith Barney that SGI would meet its goal of 40% growth, notwithstanding sluggish sales in some areas.

quarterly growth targets for Fiscal Year 1996.

Because Brody's allegations are based on information and belief,[21] she was required to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). She must therefore allege facts reflecting "the who, what, when, where, and how" with respect to the facts underlying her claim. *Advanta*, 180 F.3d 525, 533–34 (internal quotations omitted).[22] The facts alleged by Brody are of two kinds: (1) internal SGI reports indicating that the defendants were aware of problems that made their favorable statements false and misleading; and (2) allegations of "suspicious" insider trading by the defendants. There is no dispute that the allegations in the second category were sufficiently particularized, but the majority concludes that the allegations in the first category are "too generic" to meet the Reform Act's pleading requirements. *Ante*, at 988.

Brody's complaint identified three types of internal status reports allegedly containing information contrary to the defendants' public statements: (1) daily reports; (2) monthly financial reports; and (3) "Stop Ship" reports. The daily and monthly reports included manufacturing, sales, and financial data. Monthly reports were broken down into "Flash Reports," brief reports distributed at the end of the month, and "Monthly Financial Statements/Pack-ages," more detailed reports distributed within ten days of the close of the month. Brody alleged that daily and monthly reports: (1) were prepared by "SGI's financial department" (*who*); (2) informed "SGI's top managers, such as [the individual defendants]" of production problems with the Indigo2, as well as sluggish sales in North America and Europe which resulted in SGI's inability to meet its financial goals (*what*); (3) were distributed at specific times during the class period[23] (*when*); (4) were presented in the form of daily reports, "Flash Reports," and "Monthly Financial Statements/Packages" (*where*); and (5) were suppressed by the named defendants in an alleged cover-up, leading to false statements about the Indigo2, North American and European sales, and the Company's ability to meet its financial goals (*how*).

The "Stop Ship" report: (1) was prepared by "the marketing, engineering and manufacturing managers" in conjunction with Indigo2's "Program Director" (*who*); (2) informed the named defendants of "serious quality and performance problems" with Indigo2 due to defects in the computer chip (*what*); (3) was distributed to the officers in "mid-Sept.1995" (*when*); (4) was presented in report form (*where*); and (5) was suppressed by the named defendants in an alleged cover-up, leading to false statements about the production and shipping of Indigo2 (*how*).

21. Brody contends the pleading requirements applicable to allegations made on information and belief do not apply to her because her allegations are based on the investigations of her counsel, and therefore on information known personally to her. Brody's complaint includes a paragraph entitled "Basis of Allegations," which states that "Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations ... after a reasonable opportunity for discovery." Brody relies on these sources precisely because she does not have direct personal knowledge of the defen-

dants' alleged misconduct. Her complaint is therefore pled on information and belief.

22. *See also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83–84 (2d Cir.1999) ("'To state a claim with the required particularity, a complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (citations and internal quotations omitted)).

23. Brody alleged that the individual defendants received monthly financial reports "and/or" Flash Reports "on or about" October 3–4, and 10, 1995, "no later than Nov. 3 or 6 and 10, 1995," and "no later than Dec. 4 or 5 and 10, 1995."

Admittedly, Brody's allegations are not as detailed as they could have been. The complaint did not identify the specific person who drafted the reports, nor did it state with exacting detail the content of the reports; it did not include specific information about component shortages, volume shortages, or negative financial news in the internal reports, for example.[24] Such precise detail, however, is neither expected nor required at the pleading stage of the proceedings:

> [W]e cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence. Rule 9(b) proscribes the pleading of "fraud by hindsight," but neither can plaintiffs be expected to plead fraud with complete insight.

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir.1996) (citation omitted).[25]

Because Brody's complaint sets forth, in adequate detail, the factual basis for her belief that SGI and its officers committed fraud, the majority erroneously concludes that the complaint failed to satisfy the Reform Act's particularity requirements.

2.

## "Strong Inference" of Fraud

Brody's complaint alleges two factual bases for inferring scienter: (1) internal SGI reports indicating the defendants were aware of problems that made their favorable statements false and misleading; and (2) "massive" insider sales of SGI stock by the defendants during a period when the Company's stock price was peaking.

a.

## Internal Reports

Brody alleged that numerous internal reports generated by SGI revealed financial and production problems not fully disclosed to the public until months later. The majority concludes that Brody's allegations are "too generic" to raise a strong inference of scienter. *Ante*, at 988. The internal reports referred to in Brody's complaint were described in sufficient detail as to the source, relevant content, and distribution to form the basis for a strong inference that SGI's officers knew the representations they were making to the public were false when made. Brody alleged

**24.** The majority faults Brody for "fail[ing] to state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom she obtained the information." *Ante*, at 984. This criticism is not justified. As noted, the complaint described the content of the reports, identified the officers who reviewed them (*e.g.*, the named defendants), and who prepared them, albeit by department or job title (*e.g.*, "SGI's financial department" and "the marketing, engineering and manufacturing managers" in conjunction with Indigo2's "Program Director"). Greater detail was not required. *See, e.g., Stevelman*, 174 F.3d 79, 85–86 (strong inference of scienter found despite plaintiff's "fail[ure] to allege in his Amended Complaint what percentage of their [stock] holdings the other officers, besides [CEO] Bingham, liquidated in the period at issue, or how many shares they retained; he also fails to allege whether all [company] officers sold at the inflated prices, or only some of them").

The Reform Act neither explicitly nor implicitly mandates disclosure in the complaint itself of the sources of the facts alleged. The majority cites no authority to the contrary. Although disclosure will be required during discovery, *see* Fed.R.Civ.P. 26(a)(1)(A), at that time the district court can enter an appropriate order to protect informants, etc., *see* Fed. R.Civ.P. 26(c); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–35 & n. 21, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Considering "the possible retaliation that frequently results when a whistleblower is identified," *Management Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*, 151 F.R.D. 478, 481 (D.D.C.1993), the majority's criticism of Brody's complaint on this ground is unjustified.

**25.** *See also Press*, 166 F.3d at 538 (refusing to interpret the Reform Act's pleading standard in a manner that "would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual").

that "SGI's top managers, such as [the individual defendants]" received "Flash Reports" and "Monthly Financial Statements/Packages" prepared by "SGI's financial department." These reports, which were distributed in October, November, and December of 1995,[26] allegedly described production problems with the Indigo2, as well as sluggish sales in North America and Europe which were inhibiting the Company's ability to meet its financial goals.[27] The complaint alleged that although these reports disclosed "weak" sales and "net income and earnings per share well below forecasted and budgeted levels," SGI repeatedly assured investors that it would meet revenue and growth goals.

Brody also alleged the defendants received a "Stop Ship" report prepared in "mid-Sept.1995" by "the marketing, engineering and manufacturing managers" in conjunction with the Indigo2's "Program Director," which informed the named defendants of "serious quality and performance problems with the Indigo2 IMPACT Workstations due to the ASIC chip performance problems as it attempted to assemble and ship the Indigo2 IMPACT Workstations in volume in Sept. 1995." The complaint alleged that despite this information, McCracken told Morgan Stanley on September 13, 1995 that "there were no supply constraints" with respect to Indigo2, and on September 22, 1995 confirmed that "there is no problem with the product, nor is there an engineering halt."

Allegations similar to Brody's have been held sufficient to preclude dismissal under the "strong inference" standard. In *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir.1994), the plaintiffs claimed officers and directors of a bank holding company artificially inflated stock prices by misrepresenting the bank's true financial condition. *See id.* at 360. The complaint alleged that while the company's public statements characterized its loan review capabilities as "strong" and its approach to loan reserves as "conservative," internal reports warned directors of problems in the loan review department and "serious deficiencies" in the bank's loan reserves. *Id.* at 363–64. The allegations were held sufficient:

> [P]laintiffs do more than simply identify management problems or point to statements that put a positive spin on the company's circumstances, without indicating how or why defendants should have known the descriptions were inaccurate. Rather, these paragraphs present a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their [loan reserves], and what the company was telling the public *at the same time*.

*Id.* at 365 (emphasis in original).[28] Similarly, Brody's complaint alleges how and why SGI should have known its public statements about sales growth and Indigo2 production were false and misleading, and provided the basis for a strong inference of fraud by contrasting what Company officials were hearing internally and what

---

**26.** *See supra* note 24.

**27.** Paragraph 36 of the complaint is representative:

36. As a result of the problems with the ASIC chips for use in the Indigo2 IMPACT Workstation, as well as weak sales in North America due to problems with SGI's North American direct sales force, weak OEM sales and weaker than expected sales in Europe, SGI's results for the month and quarter ended Sept. 30, 1995 were significantly below forecasted or budgeted levels. Each of the individual defendants received

this information by way of the Sept. "Flash" report on or about Oct. 3–4, 1995, and/or the Sept. Monthly Financial Statement/Package on or about Oct. 10, 1995.

**28.** The First Circuit, like the Second Circuit, applied a "strong inference" standard with respect to scienter prior to the Reform Act. *See Maldonado v. Dominguez*, 137 F.3d 1, 9 & n. 5 (1st Cir.1998) (citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992)). As the First Circuit recently observed, albeit in dicta, the Reform Act's heightened pleading requirements do not differ from that circuit's historical standard. *See id.* at 9 n. 5.

they were telling investors at the same time. *See also, e.g., Cosmas v. Hassett,* 886 F.2d 8, 12–13 (2d Cir.1989) (strong inference test met where directors allegedly knew of import restrictions on Chinese trade but still predicted a significant part of the company's revenue would come from exports to China).

#### b.

#### Insider Stock Sales

Brody alleged that the six individual defendants engaged in "massive" insider trading, collectively selling 388,188 shares of stock and realizing aggregate proceeds of $13,821,053 during the fifteen-week class period. The majority determines that sales by two of the individual defendants "appear somewhat suspicious," *ante,* at 987, but holds that the allegations fail to raise a strong inference of scienter.

"Suspicious" stock sales by corporate insiders are circumstantial evidence of intent to defraud. *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989). Insider trading is suspicious when "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Id.* As the majority indicates, sales during the class period by three defendants with significant trading histories-McCracken, Baskett, and Ramsay-did not deviate dramatically from their prior sales. McCracken sold 60,000 shares during the class period, but routinely sold comparable blocks of SGI stock in previous quarters. Baskett and Ramsay sold 30,-000 and 20,000 shares respectively during the class period, but both previously sold larger quantities of SGI stock. If vested

stock options are considered, four of the individual defendants sold relatively modest portions of the shares they could have sold: McCracken sold 2.6% of his holdings and options; Baskett 7.7%; Ramsay 4.1%; and Sekimoto 6.9%. These facts weigh against Brody's claim. *See Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir. 1995) (sale by retired director of "less than 11% of his holdings"); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1427–28 (9th Cir.1994) (sale of "only a minuscule fraction" of stock holdings); *Apple Computer,* 886 F.2d at 1117 (collective sale of 8% of stock holdings).

However, Senior Vice Presidents Kelly and Burgess sold significant percentages (43.6% and 75.3% respectively) of the shares they could have sold, if vested options are included. If vested options are excluded, Kelly and Burgess sold 95% and 99.8% of their holdings respectively. Viewed in the light most favorable to Brody, either set of data provides support for an inference of fraud sufficient to preclude dismissal, *see Stevelman v. Alias Research Inc.,* 174 F.3d 79, 81, 84–86 (2d Cir.1999) (strong inference of fraud where complaint alleged sale of 40% of shares by CEO, and "thousands" of shares by two vice presidents); *Shaw,* 82 F.3d at 1224 (sales of 68% and 20% by two directors militates against motion to dismiss),[29] especially considering the allegation that *all* of the named defendants sold *some* stock during the class period, *see Friedberg v. Discreet Logic Inc.,* 959 F.Supp. 42, 51–52 (D.Mass. 1997) (refusing to dismiss complaint brought under the Reform Act where two officers sold 33% and 50% of their respective stock holdings, and each of the named defendants sold some stock).[30]

---

**29.** *Cf. Advanta,* 180 F.3d at 540–41 (upholding dismissal of complaint where not all defendants sold stock, and those who did sold "only small percentages of their holdings").

**30.** *Cf. Advanta,* 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported."); *Stevelman,*

174 F.3d 79, 85–86, 1999 WL 187646, at *6 ("[W]e have suggested that scienter may not be inferred 'strongly' when the alleged fraud is alleged to have benefitted only a single defendant in a corporate entity."); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 814 (2d Cir.1996) ("In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong

The majority concedes that the sales by Burgess of more than a quarter-million shares valued at $8 million appear "extremely significant for purposes of Brody's class action," *ante,* at 987, but nonetheless concludes that the allegations were insufficient:

> Brody overlooks crucial facts pertaining to Burgess's sales. Brody states that "Burgess had never before sold any of his SGI stock"; however, she omits mention of the fact that SGI acquired his Toronto company, Alias, Inc., in June 1995, and that he was legally forbidden to trade his new SGI stock until the second quarter of 1995, which embraced the period in which his sales occurred. Nor does Brody mention that Burgess remained in Toronto, in charge of Alias, Inc., without any day-to-day contact with SGI's officers or involvement in its operations. Moreover, Burgess—unlike Kelly—did not make any of the allegedly misleading statements. Under these circumstances, Burgess's stock sales do not give rise to a strong inference of fraudulent intent.

*Ante,* at 987–88. While benign explanations for insider stock sales, if unrebutted,[31] are properly considered on a motion for summary judgment, *see, e.g., Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996), review under Rule 12(b)(6) is confined to the allegations of the complaint, which must be accepted as true, *see, e.g., Rubinstein v. Collins,* 20 F.3d 160, 169 n. 38 (5th Cir.1994) (refusing to look beyond the four corners of the complaint when reviewing a motion to dismiss even though defendants claimed that the alleged insider stock sales "were innocuous because they were made in response to tax considerations").[32]

Considering the allegations regarding insider sales and the allegations regarding internal corporate memoranda together, Brody successfully surmounted the Reform Act's pleading hurdle. As the Supreme Court has noted, "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (examining the "simple facts of evidentiary life"). The allegations regarding the internal reports, if true, tend to show that the defendants knowingly misrepresented SGI's ability to meet its growth targets, and knowingly or recklessly misrepresented the Company's internal affairs, particularly with respect to the production and distribution of Indi-

---

inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *Acito,* 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." (citation and quotations omitted)).

**31.** The "crucial facts" upon which the majority relies conflict with the allegations in the complaint. For example, the majority claims that Burgess was "without any day-to-day contact with SGI's officers or involvement in its operations," *ante,* at 987, but the complaint alleges that Burgess was "a Senior Vice President of the Company in charge of software development including the software used in the Indigo2 IMPACT workstation gate arrays. Because of defendant Burgess' posi-

tion with the Company, he knew of the adverse non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith."

**32.** The majority also relies on the fact that the defendants "[c]ollectively" retained a large percentage of their stock holdings. *Ante,* at 987. However, "an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC." *Worlds of Wonder,* 35 F.3d at 1427.

go2 workstations. Coupled with the allegations of suspicious stock sales by Burgess and Kelly and across-the-board stock sales by all the individual defendants, plaintiffs' allegations are sufficient to raise a "strong inference" of fraud. Because it does not "appear[ ] beyond doubt that plaintiff can prove *no* set of facts in support of [her] claim which would entitle [her] to relief," *Neubronner*, 6 F.3d at 669 (emphasis added, internal quotations omitted), dismissal was unwarranted.